**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Herbert J. LEWIS and Vernon Abrahams, Defendants-Appellants.**

No. 85–4838.

United States Court of Appeals,
Fifth Circuit.

April 15, 1986.

Robert R. Race, New York City, for Lewis and Abrahams.

Vernon Abrahams, pro se.

Joseph S. Cage, Jr., U.S. Atty., Dosite H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., for the U.S.

Before GEE, REAVLEY, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Herbert J. Lewis and Vernon Abrahams appeal convictions related to their involvement in a fraudulent investment scheme. We hold that they were not deprived of their rights under the Sixth Amendment, notwithstanding their claims that their counsel was inadequate and was subject to a conflict of interest, nor was there error in the government's use of redacted portions of Lewis' grand jury testimony against him during the trial. Thus, we affirm in all respects.

## I. FACTS

Lewis and Abrahams were each indicted and later convicted on four counts relating to their participation in a fraudulent investment scheme.[1] According to the indict-

---

1. Lewis and Abrahams were both named in each of four counts of the indictment. Count One charged them with inducing Earl Martin to travel interstate in the execution of a scheme and artifice to defraud. *See* 18 U.S.C. § 2314. Count Two charged them with conspiracy to (1) induce Martin to travel interstate in the execution of a scheme and artifice to defraud and (2) transport in interstate commerce $5000 ob-

tained by fraud from Martin. *See* 18 U.S.C. §§ 371, 2314. Count Three charged Lewis, as aided and abetted by Abrahams, with transporting in interstate commerce $5000 fraudulently obtained from an organization known as Barter Systems International ("Barter Systems"). *See* 18 U.S.C. § 2314. Count Four charged Lewis, as aided and abetted by Abrahams, with transporting in interstate commerce $5000 fraudu-

ment and evidence adduced at trial, Lewis and Abrahams held themselves out to the public as partners in a financial consulting enterprise named Security Financial Consultant, Inc. ("Security Financial"). During 1983 and early 1984 they met with several individuals, some of whom were seeking loans for various business or financial projects. Lewis and Abrahams obtained funds from these individuals, but they did not invest these funds as contemplated, instead diverting them to their personal use.

Although never providing any actual return, the investment scheme offered by Lewis and Abrahams was a shadowy but supposedly very lucrative opportunity for the investor. They would convince a prospective investor that they knew of a source of "prime bank promissory notes," which could, for a fee, be used as collateral for loans. They would then propose a partnership with the investor, who contributed a sum of money ranging from $10,000 to $25,000 to be deposited to a sinking fund at a Georgia bank. After Lewis and Abrahams were to add their own funds, the prime bank promissory notes were to be purchased as collateral. Lewis and Abrahams were then to use this collateral to negotiate low interest loans to the partnership in sums of $100,000,000 from overseas or Canadian lenders. The partnership would then somehow repay the loans with the prime bank promissory note, producing a "fallout" or profit to the partnership of millions of dollars. Instead of placing the investors' money in the sinking fund as promised, Lewis and Abrahams would divide it and use it for their own purposes.

One such investor was Earl Martin. According to his testimony at trial, Martin was a former employer of Lewis' who was seeking financing for an apartment construction project. Lewis and Abrahams persuaded Martin to invest $25,000, which was to yield an eventual return of $2,500,-000 to $3,500,000. They promised Martin that they "had turned a lot of deals" successfully, and Lewis promised to return

lently obtained from Martin. *See* 18 U.S.C. § 2314.

Martin's investment if the plan failed. Abrahams told Martin that he had a Swiss bank account with over $100,000 in it to reimburse Martin. At their request, Martin brought $25,000 in cash from his home near Houston, Texas, to Lake Charles, Louisiana. They informed Martin that the $100,000,000 loan would come from a source in Quebec, Canada. They persuaded him to create and use stationery for a fictional company, "Martin Enterprise," to draft loan requests and other documents. A Georgia attorney wrote to "Martin Enterprise" and confirmed that $100,000,000 in collateral was assigned by a Georgia trust fund for his use. The attorney received $5000 from Lewis and Abrahams. When Martin later was unable to receive an accounting or repayment of his money, he went to federal law enforcement authorities.

A grand jury issued a subpoena to Lewis requesting his appearance and the production of various documents. Lewis retained an attorney, Eddie L. Stephens, to represent him. Lewis testified before the grand jury, admitting his and Abrahams' roles in the schemes but insisting that no fraud occurred. According to Lewis, Martin and the other investors knew that the venture entailed a high risk of failure. During his testimony Lewis was advised of his right not to incriminate himself, and he was allowed to consult with Stephens outside the presence of the grand jury. Lewis continued his testimony, admitting that he and Abrahams received $25,000 from Martin. The grand jury later issued an indictment naming Lewis and Abrahams.

After a brief period when he was also represented by Stephens, Abrahams retained his own counsel, Steven Hale. Five and one-half weeks before trial commenced, another group of retained lawyers filed a notice of appearance for the joint representation of both defendants. The district court conducted a hearing to determine whether Lewis and Abrahams both agreed to joint representation, notwithstanding any potential conflicts of interest.

Satisfied that they understood the potential conflict of interest and agreed to joint representation, the court permitted the substitution of counsel. The new group of lawyers, composed of three other attorneys, conducted their joint defense at trial. Lewis and Abrahams now have a different attorney representing them on appeal.

At trial, the government produced a number of witnesses to link Lewis and Abrahams to the fraudulent schemes. Among these were the Georgia attorney involved and officials from the Georgia Bank. Also testifying were Martin and Jerry Stephens of Barter Systems, who had lost $10,000 to Abrahams and Lewis in a similar scheme. The government put on other witnesses who had lost money to Lewis and Abrahams, including a real estate investor and a railroad switchman. The government successfully introduced redacted portions of Lewis' grand jury testimony and extensive documentary evidence. The defense called three witnesses, placed supplementary documents in evidence, but neither Lewis or Abrahams testified. The jury found both of them guilty on all counts.

Lewis and Abrahams challenge their conviction on two major grounds. First, they claim that they were denied the effective assistance of counsel, both because their representation was poor and because their defense team was tainted by a conflict of interest. Second, they contend that Lewis' grand jury testimony was improperly admitted at trial, both because the government did not furnish the defense with a copy during discovery and because the redacted version impermissibly implicated Abrahams.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

### A. Inadequacy

■ "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components." *Strickland v. Washington,*

466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). First, "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 693. Second, "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Thus, both a deficiency and resulting prejudice must be shown. *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir.1985). Since we believe that Lewis and Abrahams have not demonstrated prejudice, we need not determine the magnitude of the alleged deficiency.

Lewis claims that his pretrial representation by Stephens was deficient in several respects.[2] First, Lewis claims that at the time he retained him, Stephens was not admitted to practice in federal court, had only one year of experience practicing law, and was unfamiliar with local court rules and the Federal Rules of Evidence. Second, Lewis claims that Stephens misadvised him about his grand jury testimony, telling Lewis that he had to answer all questions or risk arrest for contempt. Third, he argues that Stephens conducted inadequate pretrial investigation, and failed to gain court permission for Lewis to travel out of state to prepare his defense. Fourth, he claims that Stephens mishandled a hearing on alleged governmental misconduct.

■ Lewis' initial complaint, that Stephens was inexperienced, has little merit. An attorney can render effective assistance of counsel even if he has had no prior experience in criminal advocacy. *See United States v. Kelley,* 559 F.2d 399, 401 (5th Cir.), *cert. denied,* 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 497 (1977). "Whether the defendant has been afforded his right to counsel depends on whether the attorney is reasonably likely to render and does render reasonably effective assistance, not on

---

**2.** Abrahams concedes that his pretrial representation by Hale "was indeed what could reasonably be expected of a defense counsel," and he does not challenge Hale's actions on his behalf.

whether counsel has an extensive background in criminal defense work." *Id.* (citing *Herring v. Estelle,* 491 F.2d 125, 126 (5th Cir.1974)). When the district judge discovered that Stephens had not been admitted in federal court, he allowed Stephens to enroll. Lewis has not pointed to any specific errors that resulted from Stephens' alleged lack of familiarity with local court rules or evidentiary rules.

■ Lewis has also been unable to demonstrate any prejudice resulting from Stephens' alleged advice that he answer all questions put to him at the grand jury proceedings. The federal prosecutor who conducted the proceedings advised Lewis of his rights to remain silent and not incriminate himself. The prosecutor advised Lewis of these rights both prior to his testimony and at a point during his testimony, and received Lewis' assurances that he understood.[3] The prosecutor's warnings cured any misadvice Lewis may have received from Stephens. *Cf. Bonvillain v. Blackburn,* 780 F.2d 1248, 1253 (5th Cir.

---

3. The prosecutor advised Lewis of his rights at the start of the grand jury proceedings:

Q Mr. Lewis, you are appearing here before the federal grand jury in Lafayette pursuant to your receipt of a subpoena duces tecum, is that correct?
A That is correct.
Q And that subpoena requested that you bring certain of your corporate records with you, is that correct?
A Yes, sir, documents.
Q Documents, okay.
A Yes, sir.
Q Before we start, for the record and for your protection, I want to advise you of your rights and that you have already been notified that you are a target of this grand jury inquiry. You have, of course, the right to remain silent and anything you say can be used against you in a court of law. And you have, of course, a right to consult with counsel and to have him with you for this session of the grand jury, although he cannot be in the grand jury room with you he can be outside. And you are represented by counsel, I understand, is that correct?
A Correct.
Q And your attorney is Mr. Eddie [Stephens]?
A Correct.
Q And he is outside, is that correct?
A That is correct.
Q Okay. You have a right to consult with him at any time during this proceeding. If you have a question that you want to ask him, you have a right to see him and we will let you outside and talk to him. Of course, since you have retained Mr. Stephens, the indigency requirements of the warning of rights is not necessary to be given to you. The key thing is you have a right to remain silent. That anything you say can be used against you. And you have a right to be represented by an attorney in this matter. Do you understand those rights?
A I understand them.
The prosecutor later reiterated these rights when it appeared likely that Lewis would incriminate himself.

Q I, on behalf of the grand jury, offer you an invitation to discuss with the grand jury and answer questions of the grand jury and of myself pertaining specifically to the deals that we are talking about, Earl Martin, et cetera, with the understanding, of course, that I have warned you of your rights. You understand you do not have to. You have the right not to incriminate yourself for whatever reason. I give you the opportunity with the understanding that you do not have to, and I am not trying to force you to, and I want you to have a chance to talk to your lawyer first.
A Sure.
Q So it is an invitation to appear before the grand jury at this time for other than producing the records. Okay?
A Yes, sir.
Q Now, if you would consult with your attorney, I would appreciate it and you can give me an answer. (Thereupon the witness left the grand jury room and returned)
[By the prosecutor:]
Q Okay. We are back on the record. Mr. Lewis, have you had an opportunity to consult with your attorney, Mr. [Stephens]?
A Yes, I did.
Q And have you made a decision?
A I am ready to proceed, sir.
Q Okay. You are voluntarily appearing before the grand jury at this time?
A We understand that.
Q Okay. That is a yes answer?
A A yes answer.
Q Okay. And you are willing to answer questions specifically as to these individual transactions knowing that what you say will be recorded and could be used against you in a court of law.
A Sure, sure.
Q Is that correct?
A Sure.
Q And this is being done on the advice of your attorney?
A Right, right.
Q Okay. Let's see where we can start.

1986) (sentencing judge's instruction to defendant on potential prison term could cure defense counsel's misrepresentation) (citing *Martin v. Blackburn,* 606 F.2d 92, 94 (5th Cir.1979), *cert. denied,* 446 U.S. 911, 100 S.Ct. 1841, 64 L.Ed.2d 265 (1980)). Moreover, Lewis has given us no reason to believe that he would have refused to testify had Stephens' advice been accurate.

■ Lewis' claim that Stephens conducted inadequate pretrial investigation is without merit. Lewis has not suggested what exculpatory evidence could have been uncovered by further investigation, nor has he shown how his travel outside the state would have produced favorable evidence. Since Lewis has not pointed out any evidence which would have been produced by more thorough investigation, much less evidence that would be sufficient to undermine confidence in the outcome of the trial, no prejudice has been shown. *See Berry v. King,* 765 F.2d 451, 454 (5th Cir.1985).

■ Lewis' final [4] claim, that Stephens mishandled a hearing on governmental misconduct, is similarly flawed. Lewis makes conclusory claims that Stephens was unprepared and performed inadequately at the hearing, which was to resolve Lewis' allegations that improper threats had been made by federal investigatory agents. At the hearing Stephens explained to the district court that further investigation by him and Hale had shown these "rumors" were unfounded. Lewis has not indicated that his allegations had any basis in fact, and points to nothing that Lewis could have done or failed to do in order to substantiate these claims. In sum, Lewis has

demonstrated no prejudice as a result of his pretrial representation by Stephens.

■ The challenges Lewis and Abrahams make to the effectiveness of their later representation by the defense team that represented them at trial also fail to demonstrate the requisite prejudice. They claim that the defense team failed to seek a continuance for further investigation, although there is still no indication of what further evidence would have been obtained or what effect it would have had on the trial. They claim the defense team failed to obtain from Stephens a transcript of Lewis' grand jury testimony, but the defense team did obtain a transcript from Hale and had sufficient opportunity to examine this testimony and redact the portions inculpating Abrahams. They claim the defense team failed in unspecified ways to "anticipate or prepare defenses," to "adequately prepare legal arguments or apprise themselves and the court of the relevant law," to "make a proper record on appeal," and to press "viable motions." Lewis and Abrahams have not described these latter supposed faults in sufficient specificity for us to even know what the alleged errors were, and we have no inkling as to what prejudice may have resulted.

### B. Conflict of Interest

Lewis and Abrahams contend that their joint representation at trial constituted a conflict of interest and a violation of their rights to the effective assistance of counsel. They have not, however, indicated any instance where their joint counsel sacrificed the interests of either Lewis or Abrahams in order to benefit the other.[5] Lewis

---

**4.** Lewis has also claimed that Stephens is to be faulted for filing an inadequate number of pretrial motions. Stephens filed motions for discovery and inspection, discovery of prosecution witnesses, and for release of Lewis' passport. Lewis has not indicated how other motions would have led to a different result in his case. "Counsel is not required to engage in the filing of futile motions. The filing of pretrial motions falls squarely within the ambit of trial strategy." *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir. 1984) (citing *Williams v. Beto,* 354 F.2d 698, 703 (5th Cir.1965)).

**5.** We do not agree with their bland assertion that "prejudice is readily apparent from examination of the record." The only specific example of prejudice cited in their brief was when the district court allegedly "refused to consider certain objections because the [sic] related to only one of the defendants or were in opposition to the other defendants [sic] position and often treated the two defendants as one although they were in distinct positions." The citation to the record which followed this claim indicates that the alleged prejudice was the defense counsel's withdrawal of its request to have

and Abrahams suggest that their interests were inherently in conflict.[6] They claim that the hearing to determine potential conflicts of interest conducted pursuant to Fed.R.Crim.P. 44(c) was inadequate.

■■■ We note that a conflict of interest claim is judged under different standards from other types of ineffectiveness allegations. Such a claim warrants a limited presumption of prejudice. *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696. "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest." *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345–50, 100 S.Ct. 1708, 1716–19, 64 L.Ed.2d 333, 344–47 (1980)). However, this presumption is a limited one, for "the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719, 64 L.Ed.2d at 348. Lewis and Abrahams have not asserted any adverse affect on their representation resulting from a conflict of interest.

Moreover, we find that the district court adequately protected each defendant's right to counsel as contemplated by Rule 44(c).[7] The district court carefully questioned Abrahams and Lewis, posing potential conflict of interest situations to them. Alerted to the conflict possibilities, each insisted that he desired joint representa-

tion. Each defendant understood his right to separate counsel, but declined to exercise this right. Our review of the transcript of this hearing convinces us that Lewis and Abrahams each made a knowing, intelligent, and voluntary waiver of the right to separate representation. "[A] defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests." *Holloway v. Arkansas*, 435 U.S. 475, 482 n. 5, 98 S.Ct. 1173, 1178 n. 5, 55 L.Ed.2d 426, 433 n. 5 (1978) (citing *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). Without the possibility of such a waiver, joint representation would be impossible, even in cases where "[a] common defense ... gives strength against a common attack." *Glasser*, 315 U.S. at 92, 62 S.Ct. at 475, 86 L.Ed. at 710–11 (Frankfurter, J., dissenting).

### III. GRAND JURY TESTIMONY

#### A. Discovery

Abrahams and Lewis contend that the grand jury testimony of Lewis was inadmissible because the government did not produce it in response to their discovery requests. The record demonstrates that the factual predicate of this claim is incorrect. Lewis, while represented by Stephens, moved for discovery and inspection of the government's evidence, including "any oral inculpatory statement or confession." Abrahams, while represented by Hale, moved for discovery and inspection

Lewis read the answers to his grand jury testimony in court. The defense counsel suggested that a mistake by Lewis in reading a portion of the redacted testimony might implicate Abrahams, and the district court instead had a member of the court staff read the answers. We are not able to discern the prejudice to either Lewis or Abrahams in having the redacted testimony read accurately.

6. Appellate Counsel for Lewis and Abrahams on appeal does not indicate how their interests could diverge so sharply during trial as to require reversal while not being so distinct now as to require separate appellate counsel.

7. The district court held a hearing to determine the adequacy of the joint representation pursuant to the following:

Joint Representation. Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

Fed.R.Crim.P. 44(c).

of any evidence the government intended to use in its case in chief and of any statements by Abrahams, as well as of any statements made by a co-conspirator. The government's response to these motions stated that "The Government will, with leave of the Court, make available to counsel for the defendant the Grand Jury transcript of co-defendant Herbert J. Lewis...." Stephens obtained a copy of Lewis' testimony, although Lewis' later defense team seems to have had some difficulty in acquiring it from Stephens. A copy was also made available to Hale on behalf of Abrahams, and he based a motion to sever on the impending use at trial of Lewis' admissions before the grand jury. The joint defense team later acquired this copy from Hale, shortly before they made a formal appearance in the case. Thus, all defense counsel involved had prompt access to Lewis' testimony.[8]

### B. Redaction

Abrahams [9] finally contends that Lewis' grand jury testimony was inadmissible because it implicated him in the scheme. Abrahams suggests that, as an incriminating extrajudicial statement of a non-testifying codefendant, Lewis' grand jury testimony violated his rights under the confrontation clause. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Alternately, Abrahams claims that the redaction of Lewis' grand jury testimony was faulty, permitting references to Abrahams to remain. Abrahams concludes that severance rather than redaction was the only proper course for the district court to follow. He also claims error in the district court's failure to give limiting instructions to the jury regarding the purpose of the grand jury testimony.

"Application of the *Bruton* rule, however, requires a more discriminating approach than exclusion of all out of court confessions by co-defendants. Courts must exclude these confessions only when they directly inculpate the complaining co-defendants, as well as the declarant." *United States v. Hicks*, 524 F.2d 1001, 1003 (5th Cir.1975) (citations omitted), *cert. denied*, 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976). "A codefendant's confession is admissible in a joint trial if references to the other codefendants are deleted." *United States v. Gray*, 462 F.2d 164, 165 (5th Cir.) (citations omitted), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 452, 34 L.Ed.2d 303 (1972). Here, the defense team and the prosecutor carefully examined the transcript of Lewis' grand jury testimony to eliminate all inculpatory references to Abrahams. Whenever the parties were unable to agree on a redaction, the district court intervened to decide the particular issue. The court without exception ruled for the defense on every disagreement, stating that it preferred to err, if at all, on the side of caution.

■ Abrahams now argues that the redacted version of the transcript still contained some references to him. Our review of the trial transcript reveals instances where Abrahams was referred to by name during the reading of Lewis' testimony. Lewis stated that Abrahams was an officer of an enterprise known as Herbess Minerals, Ltd., of which Lewis was the president. Lewis clarified that this enterprise, a mining operation, was separate from the consulting business he did at Security Financial, and that Abrahams was not an officer of Security Financial. Thus, these two references, if they have any impact at all on

8. Lewis and Abrahams also make the frivolous argument that, although they knew of the existence and substance of Lewis' grand jury testimony, they did not know that the government intended to use it in its case in chief. The district court dismissed this argument, for Lewis is never asked for a listing of what evidence the government intended to use, and Abrahams was not entitled under Fed.R.Crim.P. 16(a)(1)(A) to discovery of Lewis' statements. The parties agree that Lewis' grand jury testimony was not admissible against Abrahams under Fed.R.Evid. 801(d)(2)(E) as statements of a co-conspirator,

since the conspiracy had ended by the time Lewis appeared before the grand jury and made the statements. In any event, the district court eliminated any possibility of prejudice by permitting the defense team ample time during trial to reexamine the transcript of Lewis' testimony and request redactions.

9. Lewis, except for the alleged discovery violations, does not challenge the admission of his grand jury testimony.

the case against Abrahams, are probably exculpatory.

A third reference in the transcript was in the prosecutor's reading of a document assigning to a Georgia law firm the proceeds of a loan from Martin Enterprise. The assignors were named as Lewis and Abrahams. However, this document was independently placed in evidence by the prosecution. The district court, upon an objection by the defense team, ordered the transcript read again, this time without this reference to Abrahams. We are unable to discern any prejudice to Abrahams in this mention of his name in a document already before the jury. A fourth and final reference to Abrahams occurred when Lewis stated that "a friend of Mr. Abrahams" had been interested in entering into an investment deal with Barter Systems. This reference did not indicate or imply that Abrahams was otherwise involved with Lewis' dealings.[10]

 Moreover, the counsel for the defense, with the exception of the assignment document, never brought these references to Abrahams to the attention of the district court.[11] Nor did they request limiting instructions as to the use of the redacted transcript.[12] As a general rule, issues must be presented to the trial court to receive appellate consideration unless to ignore them would result in a "fundamental miscarriage of justice," *see Mitchell v. M.D. Anderson Hospital,* 679 F.2d 88, 91–

---

**10.** Abrahams also objects to the presence of "we" and "us" at various places in the transcript, contending that Lewis' use of the plural form indicates an association with Abrahams. We do not agree that these references in any way pertain to Abrahams. Moreover, even if they did, references to the number of persons involved in criminal activity presents little prejudice. The key concern was not that a crime took place, or that it involved more than one participant, but that Abrahams was involved. *See Hicks,* 524 F.2d at 1003. *See also United States v. Stewart,* 579 F.2d 356, 359 (5th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1978).

**11.** Although Lewis and Abrahams do not cite this as an example of prejudice on their ineffective assistance claim, we feel compelled to treat it as such. Thus, even had the defense team's performance been completely flawless, there would still be no reversible error on appeal.

92 (5th Cir.1982), or a "grave injustice," *see Masat v. United States,* 745 F.2d 985, 988 (5th Cir.1984). "This court is solely a court of appeals, and its powers are limited to reviewing issues raised in, and decided by, the trial court." *Id.* The failure to object to the admission of evidence waives any ground of complaint against its admission, absent "plain error." *See, e.g.,* Fed.R.Evid. 103; *United States v. Vesich,* 724 F.2d 451, 462 (5th Cir.1984). We conclude that no such error was committed by the district court.

Accordingly, the judgments of the district court are AFFIRMED.

---

Overwhelming testimony from several other witnesses, including Martin, linked Abrahams to the investment schemes. In the face of this incriminating evidence, we are unable to say that there was a reasonable probability of Abrahams' acquittal absent these stray, unobjected-to references to Abrahams.

**12.** We note that a district court's cautionary instruction that the declarant's statement could not be considered as evidence against another defendant has been used as partial support for affirmance of the admission of a redacted statement. *See Stewart,* 579 F.2d at 359. We hold only that, in view of the innocuous nature of the references to Abrahams and the overwhelming evidence from other sources linking him to the scheme, the district court's failure to give such an instruction did not constitute a grave injustice.