904 F.2d 936
 UNITED STATES of America, Plaintiff-Appellee,
v.
Franklin D. SCHMICK, Joseph Edward Parr, William Jerry
Pruett, Danny Franklin Johnson, Marshall Mitchell,
Ken Vodron, and Dale Lynn Brewer,
Defendants-Appellants.
 No. 89-1174.
 United States Court of Appeals,
Fifth Circuit.
 June 19, 1990.
 
 Mike Brown, Brown, Harding, Brown, Fargason & Rice, Lubbock, Tex., for Schmick.
 Richard A. Anderson, Dallas, Tex., for Pruett, Johnson, Mitchell, Parr and Vodron.
 S. Michael McColloch, Dallas, Tex., for Brewer.
 Delonia A. Watson and Mark D. McBride, Asst. U.S. Attys., Marvin Collins, U.S. Atty., Dallas, Tex., for U.S.
 Appeal from the United States District Court for the Northern District of Texas.
 Before WISDOM, JOHNSON, and DUHE, Circuit Judges.
 DUHE, Circuit Judge:
 
 
 1
 Franklin D. Schmick, William Jerry Pruett, Ken Vodron, Danny Franklin Johnson, Dale Lynn Brewer, Joseph Edward Parr, and Marshall Mitchell appeal their convictions for conspiring to violate various federal firearms laws. We affirm in part and reverse and remand in part.
 
 
 2
 Trial established the following sequence of events: On April 30, 1983 a member of the Bandido Motorcycle Club was fatally shot by a member of the Banshee Motorcycle Club. On May 1, 1983 Ronald Jerome Hodge, National President of the Bandidos determined that revenge on the Banshees would be carried out by Bandido national officers. He ordered all Bandido members to clean up their appearances in order not to attract attention of law enforcement officers during the implementation of the retaliatory action.
 
 
 3
 The funeral for the felled Bandido took place in Houston, Texas on May 4, 1983. The following day Hodge presided over a meeting of Bandido national officers in Houston. Present at the meeting were National Vice President Alvin Chester Frakes; National Secretary-Treasurers William Jerry Pruett and Franklin D. Schmick; and National Sergeants at Arms Ken Vodron, Joe Edward Benavides, Crandle Phillip Lamonte Presnel, Adams Otis Fisher, and John Randal Hanson. Though no specific plan of retaliation was formulated during this meeting, the purpose of the meeting was to begin to organize a systematic plan for killing as many Banshees as possible.
 
 
 4
 Hodge instructed the men to gather intelligence on the Banshees in order to discover their schedules, where they lived, and how they spent their leisure time. To facilitate retaliation, Hodge ordered his men to obtain unregistered firearms that could be disposed of after the retaliatory action without being traced. Schmick and Pruett were to collect $100 from each Bandido member to finance the retaliation. Fisher was to set up a safe house in north central Texas, where there was no Bandido Club, in the event the police were in pursuit of any member after the retaliation had taken place. Hodge also established a coded message system to facilitate confidential communication. Following the meeting club members went to Vodron's house to choose assignments. Hanson, Presnel, and Benavides were assigned to carry out the scheme in the Dallas area, and Vodron was assigned to south Louisiana.
 
 
 5
 On approximately May 11, Presnel, Hanson, and Steven Glen Ryals, a member of the Lubbock chapter, drove in Pruett's station wagon from Lubbock to Dallas to meet Benavides and James Thomas Atkins, President of the Amarillo chapter, in order to conduct surveillance of the Dallas Banshees. After two or three days Benavides and Atkins left Dallas, and Hanson, Presnel, and Ryals left on May 18th. Upon returning to Lubbock, either Hanson or Benavides delivered to Pruett assessment money collected in the Dallas/Fort Worth area.
 
 
 6
 On June 8th or 9th, 1983 Hanson, Benavides, Glen Alan Wilhelm, a National Sergeant at Arms, and Keith Allen Miller, President of the Nomad chapter, drove from Lubbock to Houston in Pruett's station wagon to attend a national officers' meeting. The men took with them numerous guns and rifles. The meeting was moved on June 13th to Longview, Texas to a location near the home of Raymond Douglas Shirley, President of the Longview chapter. Attending this meeting were Hanson, Vodron, Schmick, Pruett, Presnel, Benavides, Frakes, Hodge, Fisher, Miller, and Shirley; also present were Edgar Allen Crochet, President of the Southwest Houston and Louisiana chapters; Glen Alan Wilhelm and Danny Franklin Johnson, National Sargeants at Arms; and Dale Lynn Brewer, President of the Houston Cloverleaf chapter. Longview chapter members Marshall Mitchell, Terry Lee Larque, and Joseph Edward Parr provided security outside the building in which the meeting took place.
 
 
 7
 At this June 13 meeting Schmick distributed enlarged photographs of various members of the Banshee Motorcycle Club. Johnson and Wilhelm had maps of Texarkana and had devised a plan to kill all persons present in the Texarkana Banshee clubhouse by going overland and opening fire into the club with machine guns. Mitchell was to be the get-away driver. Johnson and Wilhelm had in their possession at Shirley's house two MAC-10 machine guns illegally converted to fire fully automatic, and they openly displayed several loaded MAC-10 clips. The Dallas team had not yet devised a specific retaliatory plan.
 
 
 8
 On June 20, 1983 Hanson, Vodron, Benavides, and Presnel drove to Dallas and there located the homes of the Banshees who were to be targets of the retaliation. During this Dallas trip, approximately on June 21, Benavides asserted that they should bomb the houses in which the targeted Banshees lived; Presnel, Vodron, and Hanson agreed. On June 24 or 25 Vodron went to Houston to obtain the necessary explosives, which he stole from a tool box on a company truck. However, Vodron was unable to return to Dallas because he had injured himself, so he sent Brewer in his stead. Brewer arrived in Dallas with two cannisters of explosives.
 
 
 9
 On June 26 or 27 Benavides, Presnel, Brewer, and Hanson, in the possession of explosives, pistols, blasting caps, a MAC-10 automatic machine gun, and hand grenades, drove to Longview to Shirley's house where Johnson and his team were preparing for the Texarkana assault. In Longview Benavides, Mitchell, Brewer, Hanson, and Presnel tested the blasting caps. Shortly thereafter Brewer and Presnel left Longview. Hanson, Benavides, and Larque remained in Longview and constructed two bombs in a trailer in which Parr lived on the edge of Shirley's property. Parr assisted by obtaining various parts necessary for the construction.
 
 
 10
 On July 1, in a rental car obtained by Mitchell, Benavides and Hanson drove from Longview to Dallas, where they met Brewer and Presnel. On July 3 the four conducted a dry run of the bombings and test-fired a machine gun, to which the men had attached a silencer. The gun had been illegally modified to fire fully automatic. The bombings occurred in the early morning hours of July 5th. Benavides planted one bomb underneath a van belonging to a Banshee; Presnel stood guard with the MAC-10 machine gun. Hanson planted the other bomb next to the gas meter attached to a house belonging to another Banshee; Brewer stood guard with the MAC-10 machine gun. Both bombs subsequently detonated, resulting in some property damage but no serious personal injuries. Johnson and Wilhelm did not follow through on their planned attack on the Banshees' Texarkana clubhouse.
 
 
 11
 Following the bombings Hanson and Benavides left for Rapid City, South Dakota in the vehicle Mitchell had rented for them. Brewer and Presnel drove to Corpus Christi to attend a motorcycle racing event organized by the Bandidos. The Corpus Christi event had long been planned to be used as an alibi for those Bandidos who actually conducted the retaliatory operations.
 
 
 12
 Twenty three Bandidos were indicted on March 31, 1988 for their participation in the conspiracy. A superseding indictment was filed September 22, 1988. The sixteen defendants remaining at the commencement of trial pled not guilty. Hanson, Shirley, and Fisher were the government's chief witnesses. After the government rested, the trial court granted the government's motion to dismiss the charges against six of the defendants. The jury found the appellants (seven of the nine remaining defendants) guilty of Count 1 of the indictment, which charged that they conspired to possess and receive illegally made and unregistered firearms in violation of 18 U.S.C. Sec. 371. Brewer was found guilty of Counts 2 and 3, which charged that he had knowingly and unlawfully received and possessed illegally made and unregistered firearms in violation of Chapter 53, Title 26 of the United States Code. Vodron and Parr were found guilty of aiding and abetting in the commission of the offenses charged in Counts 2 and 3.
 
 Superseding Indictment
 
 13
 The defendants contend that the superseding indictment, brought more than five years after the last alleged overt act, was barred by the statute of limitations because it broadened or substantially amended the original indictment. The return of a timely indictment tolls the statute of limitations as to the charges alleged therein. 18 U.S.C. Sec. 3282. United States v. Elliott, 849 F.2d 554, 561 (11th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3222, 106 L.Ed.2d 571 (1989). A superseding indictment filed while the initial indictment is pending is timely unless it broadens or substantially amends the charges made in the original indictment. Elliott, 849 F.2d at 561; United States v. Grady, 544 F.2d 598, 601-02 (2d Cir.1976).
 
 
 14
 Notice to the defendant is the central policy underlying the limitations doctrine. United States v. Italiano, 894 F.2d 1280, 1282 (11th Cir.1990); United States v. Gengo, 808 F.2d 1, 3 (2d Cir.1986). Similarly, notice is the touchstone in deciding whether a superseding indictment substantially changes the original charges. Gengo, 808 F.2d at 3. A timely, pending indictment serves this purpose by apprising the defendants "that they will be called to account for their activities and should prepare a defense." Grady, 544 F.2d at 601. See United States v. Marion, 404 U.S. 307, 322-23 & n. 14, 92 S.Ct. 455, 464-65 & n. 14, 30 L.Ed.2d 468 (1971) and Toussie v. United States, 397 U.S. 112, 114-15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). If the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against him. That is, he knows that he will be called to account for certain activities and should prepare a defense. Italiano, 894 F.2d at 1283.
 
 
 15
 The original indictment identified three conspiratorial objects regarding the manufacture of, possession of, and failure to register explosive devices. 26 U.S.C. Sec. 5861(c), (d), and (f). The superseding indictment alleged two additional conspiratorial objects relating to the possession of an illegally made and unregistered machine gun. 26 U.S.C. Sec. 5861(c) and (d). The superseding indictment also described seven overt acts beyond the 40 detailed in the original indictment. The appellants only object to three of the seven overt acts described in the superseding indictment, those that relate to the possession of the unregistered and illegally made machine gun.
 
 
 16
 We find that the superseding indictment did not substantially amend the original indictment so as to render it untimely. The original indictment gave defendants notice that they were to defend against charges that they conspired to violate the firearms statute, 26 U.S.C. Sec. 5861. Though the particular conspiratorial objective referenced there dealt with unregistered and illegally made explosive devices, the original indictment identified as one of the overt acts committed by the conspirators an order issued by Hodge, the National President of the Bandido Motorcycle Club, to "[o]btain 'unregistered' firearms for use in retaliatory strategies."
 
 
 17
 The underlying crime charged, violation of the firearms statute, was not impermissibly broadened. The superseding indictment neither added new charges nor rendered the appellants susceptible to increased punishment. The appellants were on notice that they were accused of planning to obtain unregistered firearms. The original indictment generally referred to unregistered firearms; the superseding indictment merely further described the unregistered firearms used by the Bandidos. Where the facts alleged have not been changed, although additional underlying details have been alleged, a superseding indictment brought outside the statute of limitations is timely. United States v. Friedman, 649 F.2d 199, 204 (3rd Cir.1981).
 
 Sufficiency of the Evidence
 
 18
 Pruett, Mitchell, Schmick, and Parr contend that there is insufficient evidence to allow an inference that they conspired to violate federal firearms laws. The conspiracy arose on approximately June 13, 1983, at which time Wilhelm and Johnson were in possession of two MAC-10 machine guns, modified to fire "fully automatic", to be used in their Texarkana assault.
 
 
 19
 In reviewing the sufficiency of the evidence, we view the evidence in a light most favorable to the government and with all reasonable inferences and credibility choices made in support of the jury's verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 459, 86 L.Ed. 680 (1942). The standard of review inquires whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Kim, 884 F.2d 189, 192 (5th Cir.1990); United States v. Nixon, 816 F.2d 1022, 1029 (5th Cir.1987), cert. denied, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). When making such a determination, " '[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt ...' " United States v. Henry, 849 F.2d 1534, 1536 (5th Cir.1988) (quoting United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982) (en banc), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).
 
 
 20
 A conviction for conspiracy under 18 U.S.C. Sec. 371 requires that the government prove beyond a reasonable doubt 1) an agreement between two or more persons, 2) to commit a crime against the United States, and 3) an overt act committed by one of the conspirators in furtherance of the agreement. United States v. Yamin, 868 F.2d 130, 133 (5th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989); United States v. Wheeler, 802 F.2d 778, 780 (5th Cir.), cert. denied, 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987); United States v. Ortiz-Loya, 777 F.2d 973, 981 (5th Cir.1985). No element need be proved by direct evidence, but may be inferred from circumstantial evidence. United States v. Robles-Pantoja, 887 F.2d 1250, 1254 (5th Cir.1989); United States v. Ayala, 887 F.2d 62, 67 (5th Cir.1989). An agreement may be inferred from "concert of action." United States v. Arzola-Amaya, 867 F.2d 1504 (5th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). While the prosecution must show knowledge of and intent to join the conspiracy beyond a reasonable doubt, United States v. Bland, 653 F.2d 989, 996 (5th Cir.), cert. denied, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981), it need not show that each defendant knew all the details of the conspiracy. United States v. Parrish, 736 F.2d 152, 157 (5th Cir.1984).
 
 
 21
 We find the evidence sufficient to support the jury's findings. Pruett and Schmick were the two National Secretary-Treasurers of the Bandido Motorcycle Club. They were responsible for collecting the $100 assessments and reimbursing members for funds expended on the retaliatory scheme. Bandido President Hodge had made it clear that the retaliation was to be directed by the national officers. Schmick enlarged and distributed photographs of Banshee members at the June 13 meeting so that the assault teams could identify their victims. Government witness Fisher testified that Pruett and Schmick knew about both the Texarkana assault plan and the bombing scheme before they were to be executed. Fisher also testified that following one of the Longview meetings Hodge "held court" in a back room of Shirley's house, bringing in various Bandido members and briefing them on the progress of the retaliatory scheme on a "need to know" basis. Fisher designated Pruett and Schmick as two of the national officers present for the duration of this session. There was sufficient evidence for the jury to find beyond a reasonable doubt that Pruett and Schmick knew that the retaliatory scheme would involve illegal machine guns and explosive devices and that their actions promoted the conspiracy's illegal objective.
 
 
 22
 Mitchell and Parr, though not national officers of the Bandido Motorcycle Club, were members of the Longview chapter. Many of the conspiracy's decisive events transpired in Longview. Government witness Shirley, President of the Longview chapter at the time of the conspiracy, testified that members of the Longview chapter knew that bombs were to be used in the Dallas retaliation plan. As Longview was the base of operations for the retaliatory scheme, Longview chapter members gathered supplies, clips, ammunition, and guns for the men involved in the actual acts of retribution.
 
 
 23
 Mitchell, Vice-President and later President of the Longview Chapter, was assigned to the Texarkana assault team. His role was to drive the get-away car after the overland machine gun assault on the Banshee Clubhouse. The two other members of Mitchell's team, Johnson and Wilhelm, were in possession of the two illegally converted MAC-10 machine guns. It stands to reason that Mitchell knew about the existence of the guns. Furthermore, Mitchell assisted Benavides and Hanson in testing blasting caps for use with the bomb they built in Longview. We find that there was sufficient evidence from which the jury could legitimately infer that Mitchell was cognizant of the object of the conspiracy.
 
 
 24
 Parr lived in a trailer at the back of Shirley's property in Longview. It was in this trailer the bombs were built. Parr assisted in building the bombs by fetching various parts and tools requested by Benavides, Larque, and Hanson. Indeed, Parr made purchases three separate times in order to obtain appropriate timers for the bombs. We find that a jury could have reasonably determined that Parr conspired to receive and possess illegal firearms and that he aided and abetted the receipt and possession of the bombs as alleged in the indictment.
 
 Alibi Instruction
 
 25
 Appellants Brewer and Vodron argue that the district court committed reversible error by refusing to give an alibi instruction. Brewer presented the testimony of Ed Cox, a friend of Brewer's who spent a good deal of time in Brewer's motorcycle repair shop in Houston during the summer of 1983. Cox testified that he spent as many as five days a week in Brewer's shop rebuilding a motorcycle and that he did not recall Brewer's having left Houston for any significant period of time in the latter part of June 1983. Cox did recall that Brewer left town for the July 4th weekend. Brewer points to this testimony as corroborating his own testimony that he did not travel to Dallas on June 25 and as contradicting Hanson's testimony. Brewer contends that Hanson's testimony provided the only evidence that Brewer participated in the conspiracy and possessed the bombs. Vodron argues that Brewer's alibi defense was integral to his defense insofar as Vodron denied having ordered Brewer to travel from Houston to Dallas with the explosives.
 
 
 26
 As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. Mathews v. United States, 485 U.S. 58, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988). " 'It has long been well established in this Circuit that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent.' " United States v. Rubio, 834 F.2d 442, 446 (5th Cir.1988) (quoting United States v. Lewis, 592 F.2d 1282, 1285 (5th Cir.1979)). See also United States v. Johnson, 872 F.2d 612, 622 (5th Cir.1989); United States v. Grapp, 653 F.2d 189, 195 (5th Cir.1981); United States v. Megna, 450 F.2d 511, 513 (5th Cir.1971).
 
 
 27
 Vodron's argument that he was prejudiced by the district court's refusal to give the alibi instruction is not well taken. Vodron participated in the conspiracy and aided and abetted the violation of substantive firearms laws before Brewer's alleged involvement in the Dallas operation. Vodron agreed with Benavides that bombs should be used in the Dallas retaliation, and he procured the actual explosive used to make the bombs. Thus, even had Brewer's requested instruction been given, it would not have inured to Vodron's benefit. We refrain from speculating what effect the court's refusal to give the alibi instruction had on Brewer's trial because we find other error dictating reversal of Brewer's conviction.
 
 Bruton Error
 
 28
 Brewer moved for severance or, in the alternative, a mistrial based on the admission of an incriminating extrajudicial statement made by Vodron, a nontestifying codefendant. Government witness Shirley testified that at the July 4 Corpus Christi run Vodron told him that he had gone to Houston to obtain the explosives but recruited Brewer to replace him on the Dallas team when he injured himself. The court overruled Brewer's objection to this testimony. However, on cross-examination Shirley related another statement, made by Presnel, implicating Brewer in the Dallas bombings. The court sustained Brewer's renewed objection, instructing the jury to disregard the declarations of Vodron and Presnel as they related to Brewer. The court subsequently found that the hearsay statements, though made during the existence of the conspiracy, were not made in furtherance of the conspiracy and thus were not admissible under Fed.R.Evid. 801(d)(2)(E). The court denied Brewer's motion for a mistrial. Despite the court's limiting instructions, during closing argument the prosecution referred to these declarations as corroborating Hanson's testimony regarding Brewer's participation in the scheme.
 
 
 29
 Brewer contends that the admission of statements made by Vodron and Presnel implicated him in all three counts of the indictment, corroborated Hanson's testimony, and effectively foreclosed his Sixth Amendment right to confrontation under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Bruton held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.
 
 
 30
 We find that the admission of the extrajudicial statement made by Vodron violated Bruton. United States v. Morales, 477 F.2d 1309, 1314-16 (5th Cir.1973). The hearsay reported by Shirley directly implicated both the declarants and Brewer. See United States v. Espinoza-Seanez, 862 F.2d 526, 534 (5th Cir.1988) and United States v. Lewis, 786 F.2d 1278, 1285 (5th Cir.1986). Government witness Hanson provided the only other testimony that Brewer directly participated in the Dallas bombings, and Hanson's testimony was impeached regarding particular details of the events in Dallas. When called by Brewer during presentation of his defense, both Vodron and Presnel refused to testify, asserting their rights under the Fifth Amendment. Furthermore, during closing argument the prosecutor referred to Vodron's hearsay as corroborating Hanson's testimony. Given these circumstances, we cannot assert that the impact of the statements was insignificant in light of the weight of other evidence against the defendant. Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); United States v. Miliet, 804 F.2d 853, 857-58 (5th Cir.1986). Accordingly, the trial court abused his discretion in denying Brewer's motion for new trial, and Brewer's conviction must be reversed and remanded.
 
 
 31
 In light of this holding we do not address Brewer's other claims.
 
 
 32
 For the foregoing reasons, the convictions of Schmick, Pruett, Vodron, Johnson, Parr, and Mitchell are AFFIRMED, and Brewer's conviction is REVERSED and REMANDED in accordance with this opinion.
 
 
 33
 AFFIRMED IN PART and REVERSED IN PART and REMANDED.