809 A.2d 295

COMMONWEALTH of Pennsylvania, Appellee,

v.

Michael OVERBY, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 17, 2000.

Decided Oct. 24, 2002.

Mitchell Scott Strutin, Esq., Philadelphia, for Michael Overby.

Catherine Marshall, Esq., Philadelphia, Anthony V. Pomerantz, for Commonwealth of Pennsylvania.

Before: FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice CAPPY.

This is a direct review of a sentence of death imposed by the Court of Common Pleas of Philadelphia County.[1] Although Appellant, Michael Overby, alleges numerous errors related to his convictions for first-degree murder[2], robbery[3] and conspiracy[4], we address only the issue related to Appellant's confrontation rights. *Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). For the reasons stated herein, we hold that the trial court erred in admitting the statement of Appellant's co-defendant in the manner in which it was redacted and that such error was not harmless. Accordingly, we reverse the judgment of sentence and remand for a new trial as to all charges.

1. *See* 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. 702(b) and 1941.
2. 18 Pa.C.S. § 2502(a).
3. 18 Pa.C.S. § 3901.
4. 18 Pa.C.S. § 903.

The convictions arose out of the following set of facts.[5] Ronald and June Pinkett, neighbors of Lillian Gaines, the victim, saw Isaac Young, Appellant and Gaines outside of Gaines' home between 5:00 and 5:30 a.m. on September 28, 1990. *N.T., 7/10/1996, p.* 90, 166–67. June Pinkett testified that she had seen Appellant in Gaines' presence on previous occasions. *Id.* at 94–95. She stated that on the morning of the murder, she observed Gaines crying and that she overheard a discussion concerning Gaines owing money to Appellant or some other third person. *Id.* at 91. Pinkett asked Gaines if everything was okay and Gaines responded that everything was fine. *Id.* Appellant allegedly told Ms. Pinkett to mind her own business and the three individuals then went into Gaines' residence. *Id.* at 91, 98.

Edzina Fletcher, Gaines' roommate, found Gaines early that morning with her hands and feet bound and a piece of cloth in her mouth.[6] *Id.* at 31–32. Gaines' pants were partially pulled down. *Id.* at 33. Fletcher noted that a 19″ television was missing from the home. *Id.* at 36.

Later that day, Dwayne Elliott, Appellant's co-defendant, tried to exchange a 19″ television for drugs. N.T., 7/12/1996, p. 9; N.T., 7/12/1996, p. 24.

In January of 1992, Nicole Schneyder was brought into the police station by a plain-clothes police officer for questioning regarding the murder of Gaines. She gave a statement to Detective Dominic Mangoni, a detective in the homicide division of the Philadelphia Police Department. Detective Man-

5. As explained infra, Appellant was tried for the crimes in question on two separate occasions. The evidence presented at both trials was substantially the same. However, these facts are recounted from the evidence presented at the second trial.

6. The medical examiner concluded that in his opinion, Gaines' cause of death was manual strangulation and suffocation by forcing Gaines' head into the couch. N.T., 7/12/1996, p. 49. In addition, the examiner testified that Gaines was further mistreated as her anus was distended and split into four radiating lacerations consistent with a large object being forced into the anus. *Id.* at 53–54. The examiner believed that this injury was caused by a broom handle or beer bottle being forced into the anus, but acknowledged that a penis could have made the insertion. *Id.*

goni recorded the statement verbatim and after the statement was taken, Schneyder reviewed and signed it. N.T., 7/12/1996, p. 21. Schneyder informed the police that on the day before the incident, Appellant told her that he was going to "run up", i.e., rob someone because he needed some money. N.T., 7/12/1996, p. 22. Schneyder also informed the police that about a week following the incident, Elliott told her that he was involved in the Gaines incident. *Id.* at 23. Elliott also told Schneyder that Appellant, another person and he were just there to rob the house, but that Gaines gave Appellant "a hard way to go,"; that Appellant told Elliott to grab her; that Elliott grabbed her and held her while another person tied her up, *Id.;* that Appellant strangled her, *Id.* at 23–24; and that then, Elliott removed Gaines' television from her house and took it to Miss Babe's house to sell, *Id.* at 24.

Based upon the above information, the police arrested Appellant and charged him with first-degree murder, robbery and conspiracy related to the murder of Gaines. The matter proceeded to preliminary hearing at which Appellant, Elliott and Young were present. At the preliminary hearing, the Commonwealth called Schneyder as a witness. She recanted her prior statement to the police. She testified that she did not remember speaking with either Appellant or Elliott. Further, she admitted that she made the statements, but asserted that she made them in order to "tell them [the police] what they wanted to hear so [she] could get out of homicide." N.T., 1/10/1995, p. 13. Over objections by defense counsel, Schneyder's prior statement to the police was admitted under *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986), as a prior inconsistent statement of an available witness.[7] The portion of Schneyder's statement that contained Elliott's inculpatory statement to Schneyder was redacted to omit any reference to Appellant. At the conclusion of the hearing, the court determined that the Commonwealth presented sufficient

7. Although Appellant asserts that the preliminary hearing statement was erroneously admitted under *Brady* at both trials, we need not address this argument, since we find that the court erred in admitting the statement pursuant to *Bruton*.

evidence to proceed in its case against Appellant and scheduled the case for trial.

At the first jury trial, Appellant was tried jointly with Isaac Young and Elliott.[8] Nicole Schneyder did not appear as a witness. She was declared unavailable and her preliminary hearing testimony wherein she recanted her statement to the police was read to the jury. After the preliminary hearing testimony was read at trial, Nicole Schneyder appeared. The Commonwealth and both defense counsels declined to call her as a witness. The court also allowed Detective Mangoni to read the prior statement that Schneyder made at the police station. Although counsel initially objected to Detective Mangoni's testimony, when faced with the choice of either renewing an objection to Mangoni's testimony or calling Nicole Schneyder to the stand, defense counsel did not further object to Mangoni's testimony. Following the trial, Appellant was convicted of robbery and conspiracy. The jury was undecided on the first-degree murder charge with regard to Appellant and as to all charges against Elliott. The trial court declared a mistrial, and subsequently scheduled a retrial.

At the second trial, a similar procedure was used involving the testimony of Schneyder. At the conclusion of the second trial, Appellant was convicted of first-degree murder. The jury found co-defendant, Elliott, guilty of robbery, but not guilty of murder and conspiracy. During the penalty phase, the Commonwealth incorporated the testimony that indicated that the killing occurred during a robbery, as well as the previous convictions for robbery and conspiracy. Following the penalty phase, the jury found one aggravating circumstance—that the killing occurred in the perpetration of a felony[9]—and no mitigating circumstances and sentenced Appellant to death.[10]

8. Following the presentation of most of the Commonwealth's case, the trial court granted Young's motion for judgment of acquittal based on a demurrer.

9. 42 Pa.C.S. § 9711(d)(6).

10. The Rules of Criminal Procedure provide that an appeal in a criminal matter is from a judgment of sentence. *See, e.g.,* Pa.R.Crim.P. 720.

336

■ Appellant appealed to this court, asserting, *inter alia*, that Elliott's hearsay statement to Nicole Schneyder, as redacted at both trials, violated his right of confrontation under the Sixth Amendment of the United States Constitution.[11] *Bruton v. United States*, 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Appellant urges that he is entitled to a new trial. We agree.[12]

■ Appellant's argument, that we address today, implicates the Confrontation Clause of the United States Constitution. The Confrontation Clause provides that "in all criminal

In this case, although the convictions for robbery and conspiracy occurred following the first trial, Appellant was not sentenced for these convictions until after the first degree murder conviction. Rather, he was sentenced for all the convictions at the same sentencing hearing. Thus, this appeal is Appellant's first opportunity to raise any issues related to the first trial. As we ultimately determine that Confrontation Clause violations occurred at both trials we will vacate the judgment of sentence as to all charges.

11. Appellant raises two other alleged violations of the Confrontation Clause pursuant to *Commonwealth v. Bujanowski*, 418 Pa.Super. 163, 613 A.2d 1227 (1997)(implying that recantation testimony of an unavailable witness was not admissible under *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992), since it was unreliable) and *Commonwealth v. Bazemore*, 531 Pa. 582, 614 A.2d 684 (1992)(defense must have full and fair opportunity to cross-examine witness at prior hearing in order for testimony to be admissible at a later hearing where the witness is unavailable). There is no reason to address these issues, since we are reversing the judgment of sentence based on a Confrontation Clause violation pursuant to *Bruton*.

12. In the Statement of Questions Involved, Appellant asserts that trial counsel was ineffective for failing to object to the manner in which the statements were redacted. However, in the argument portion of his brief he also raises and develops the assertion that the trial court erred admitting the statements given the manner in which they were redacted. In light of Appellant's full development of this issue in a direct appeal capital matter, it is unnecessary to address the issue in terms of trial counsel's ineffectiveness. Although Appellant has failed to present the issue in his Statement of Questions Involved in compliance with Pa.R.A.P. 2116, it would be inappropriate for this court to decline review of the issue related to the alleged trial court error, merely on the basis of what amounts to appellant's awkward phrasing of the Statements of Questions Involved.

Additionally, as made clear infra, Appellant would be hard-pressed to demonstrate trial counsel's ineffectiveness related to this claim, as counsel objected to the admission of the statement and then also objected to the redaction. Accordingly, this case presents a question of trial court error, which was preserved by trial counsel's objections.

prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is applicable to the States through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Although the origins of the Clause are obscure [13], the United States Supreme Court has reiterated that the fundamental right that the Clause seeks to preserve is the defendant's right to a fair trial. *Id.* at 405, 85 S.Ct. 1065; *see also Lee v. Illinois*, 476 U.S. 530, 539–40, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *Bruton*, 391 U.S. at 126, 88 S.Ct. 1620. The right of confrontation contributes to the perception as well as the reality of fairness in the criminal justice system by promoting an open contest between the accused and the accuser. In addition to serving these "symbolic goals ... the right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials." *Lee*, 476 U.S. at 540, 106 S.Ct. 2056. Thus, at its most basic level, the Sixth Amendment seeks to ensure that the trial is fair and reliable by preserving an accused's right to cross-examine and confront the witnesses against him.

In order to protect these rights, the Court has developed different analyses under the Confrontation Clause depending on how a statement is used at trial. For example, where a hearsay statement, given by a non-testifying declarant, is offered as evidence to establish the guilt of the non-declaring defendant, the court must consider whether it was admitted pursuant to either a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66–67, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Only if the hearsay statement was admitted under such circumstances will such a statement be deemed

---

**13.** Scholars postulate that the right of confrontation was recognized as a result of the trial of Sir Walter Raleigh, where Raleigh was convicted solely on the basis of an affidavit of questionable reliability by an alleged co-conspirator who did not appear in court. Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011 (February 1998); Alfredo Garcia, *The Winding Path of Bruton v. United States: A Case of Doctrinal Inconsistency*, 26 Am.Crim. L.Rev. 401 (1988).

to respect the non-declaring defendant's right of confrontation. *Roberts; see also Lilly,* 527 U.S. at 124–25, 119 S.Ct. 1887; *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)(admission of co-conspirator hearsay statement did not violate the Confrontation Clause because it fell within a firmly rooted hearsay exception); *Lee,* 476 U.S. at 543, 106 S.Ct. 2056. On the other hand, where a hearsay statement is not admitted against the non-declaring co-defendant as evidence, then the court must consider whether sufficient precautions have been taken to insulate the non-declaring co-defendant from spillover prejudice due to the admission of the hearsay statement. *Gray v. Maryland,* 523 U.S. 185, 195, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998); *see also Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Lee,* 476 U.S. at 542, 106 S.Ct. 2056 (explaining the purpose of the *Bruton* rule); *Bruton.* Where the precautions are insufficient, then the admission of the statement violates the non-declaring co-defendant's right to confront and cross-examine the witnesses against him. *Bruton,* 391 at 137, 391 U.S. 123; *see also Gray; Richardson.* Thus, in order to determine what Confrontation Clause analysis is proper in this case, we must initially consider whether the hearsay evidence, Elliott's statement to Schneyder, was offered to establish the guilt of Appellant, the non-declaring co-defendant.

In this case, it is clear that Elliott's statements, offered via the preliminary hearing testimony of Nicole Schneyder, were admitted against Elliott as evidence. However, the Commonwealth never argued that Elliott's statement was admissible against Appellant as evidence, nor does the Commonwealth raise such an argument to this court. Indeed, the Commonwealth redacted the statement to omit Appellant's name, demonstrating its intent to offer the statement only against Elliott. Thus, the statement was not offered to establish the guilt of Appellant and our Confrontation Clause analysis proceeds pursuant to *Bruton* and its progeny.

In *Bruton,* defendant-Bruton and his co-defendant were tried at a joint trial. At the joint trial, the co-defendant's confession to a postal inspector was admitted against the co-

defendant/declarant as substantive evidence. *Bruton*, 391 U.S. at 124, 88 S.Ct. 1620. The trial court gave an instruction to the jury, informing it that the confession could only be used against the co-defendant/declarant and could not be considered against defendant-Bruton, since the statement was inadmissible hearsay with regard to Bruton. *Id.* at 125, 88 S.Ct. 1620. Following a conviction, Bruton appealed on the basis that the admission of the statement at trial violated his right of confrontation and that the instruction was insufficient to protect his confrontation rights.

The Court granted certiorari to consider the question last addressed in *Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), "whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence." *Bruton*, 391 U.S. at 123–24, 88 S.Ct. 1620. The Court explained that the basic premise of *Delli Paoli*—that a jury could follow instructions with regard to these types of statements—no longer held true. Although the court conceded that in most cases, the jury can and will follow the judge's instructions, where there is a "powerfully incriminating extrajudicial statement", the risk that the jury will not and cannot follow the instructions is simply too great and the consequences of such a failure too vital to the defendant, "that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135, 88 S.Ct. 1620. Accordingly, the Court ultimately concluded that "in the context of a joint trial, we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." *Id.* at 136, 88 S.Ct. 1620.

Over time, the Court has further defined the contours of the rule first expressed in *Bruton*. The Court has recognized that there may be various remedies to avoid a Confrontation Clause violation. For example, in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), Clarissa Marsh was tried jointly with her co-defendant. At the joint trial, the co-defendant's confession was admitted against him

as substantive evidence. However, the statement was redacted to omit any and all reference to Marsh. *Id.* at 203–04, 107 S.Ct. 1702. Marsh testified at trial and admitted to being at the scene of the crime, but stated that she had no prior knowledge of any intent to commit a crime. *Id.* at 204, 107 S.Ct. 1702. Similar to the situation in *Bruton*, the court instructed the jury that the co-defendant's confession could not be considered against Marsh. *Id.* at 205, 107 S.Ct. 1702.

Following her conviction and affirmance of the judgment of sentence on direct review, Marsh filed a writ of habeas corpus. Marsh argued that the admission of the co-defendant's statement at the joint trial violated her right of confrontation since, even though references to her were redacted, the statement incriminated her when linked with other evidence offered at trial, i.e., her own testimony that she was present at the scene of the crime. The Court granted certiorari to consider whether *Bruton* applies to situations where the statement is only incriminating when considered with other evidence offered at trial. *Id.* at 206, 107 S.Ct. 1702.

The Court acknowledged the rule expressed in *Bruton*, but distinguished the situation in *Richardson* on the basis that the statement in *Bruton* expressly implicated the defendant, whereas in *Richardson*, the statement only became incriminating when linked with evidence introduced later at trial. *Id.* at 208, 107 S.Ct. 1702.

> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination and hence more difficult to thrust out of mind.

*Id.* Accordingly, the Court implied that the holding in *Bruton* was limited to a confession that was "incriminating on its face" and could be complied with by redaction.[14] *Id.* at 208–09, 107 S.Ct. 1702.

**14.** Although the Court determined that the redaction did not violate Marsh's right of confrontation, ultimately the Court remanded the case

This court has applied the Confrontation Clause jurisprudence developed by the Supreme Court. In *Commonwealth v. Johnson*, 474 Pa. 410, 378 A.2d 859 (1977), we held that consistent with *Bruton* the Commonwealth could introduce a redacted statement into evidence at a joint trial only if that statement did not refer to the other defendant. Further, prior to the Court's decision in *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) [15], we held that the substitution of a co-defendant's name with the letter "X" or

for further consideration in light of the fact that the prosecutor sought to undo the effect of the limiting instructions by encouraging the jury to use the statement when considering the case against Marsh. *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702.

**15.** Most recently, in *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), the Court considered the scope of the protective rule first announced in *Bruton* by examining its decisions in both *Bruton* and *Richardson*. In *Gray*, the Court explained that *Richardson* placed those statements that incriminate by inference outside the scope of the *Bruton* rule. *Id.* at 195, 118 S.Ct. 1151. However, "inference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton's* scope confessions that use shortened first names, nicknames, descriptions. . . ." *Id.* Thus, in considering whether the inference was outside the scope of *Bruton*, a court must consider "the *kind* of, not simply the *fact* of" inference that it raises. *Id.* at 196, 118 S.Ct. 1151. Where the inferences do not refer directly to the defendant and become incriminating only when linked with other evidence at trial, those inferences fall outside the scope of the *Bruton* rule. *Id.* at 195–96, 118 S.Ct. 1151 (noting that *Richardson* placed outside the scope of *Bruton*, those statements that only incriminate inferentially). On the other hand, where the inferences "involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and involve inferences that a jury ordinarily could make immediately" then the admission of such statements violate the protective rule announced in *Bruton*. *Id.* Ultimately, the Court held that a confession which substituted blanks, the word "delete," or an obvious symbol violated the Confrontation Clause. *Id.* at 192, 197, 118 S.Ct. 1151.

Gray has no relevance to our holding today, since this court has previously determined that *Gray* announced a new rule of law that should not be applied retroactively. *See Commonwealth v. Lopez*, 559 Pa. 131, 739 A.2d 485, 500 n. 18 (1999). However, our opinion today does not rely on the holding in *Gray;* rather we look to *Gray* only for the Court's clarification of the distinction between *Bruton* and *Marsh*. Any discussion of *Gray* is limited to demonstrate the Court's development of Confrontation Clause law. Neither our analysis or discussion of this matter would be altered in the absence of the Court's decision in *Gray*, since ultimately, this case turns on the fact that the statements, as admitted, violated the rule set forth in *Bruton*.

similar redaction did not violate the Confrontation Clause. *See Commonwealth v. Miles,* 545 Pa. 500, 681 A.2d 1295, 1300 (1996)(following *Commonwealth v. Lee,* 541 Pa. 260, 662 A.2d 645 (1995)). However, in *Miles,* we also indicated that the use of a co-defendant's nickname in a statement was a violation of the *Bruton* rule. *See id.* at 1301.

Thus, based upon the above, it is clear that a statement cannot expressly implicate a non-testifying co-defendant. *Marsh, Johnson.* If the implication only arises following the introduction of other evidence at trial, then redaction and a limiting instruction may be sufficient to cure the potential prejudice to the defendant. *Marsh.* However, where an express implication exists, a jury instruction is insufficient to cure the prejudice to the non-testifying co-defendant and the statement violates the Confrontation Clause. *Bruton.* Employing these rules in the case at hand, we find that the statement at issue expressly implicated Appellant in the crime in violation of the Confrontation Clause.

At the first trial, the Commonwealth read the record of Nicole Schneyder's preliminary hearing testimony to the jury. The court admitted the record as a prior recorded statement of an unavailable witness. The record contained, *inter alia,* the following portions of Schneyder's prior statement to Detective Mangoni:

> Question [by Detective Mangoni]: Nicole, do you have any knowledge concerning her [Gaines'] murder?
>
> Response: Yeah. On Thursday the day before she was killed Michael Overby, they call him Hickey, and me were talking in his car. . . .

N.T., 11/21/1995, p. 23. Thereafter, the following part of Schneyder's statement to the police containing Elliott's hearsay statement was read to the jury,

> [Response continued]: He [Elliott] said that Lillian opened the door and he said that Lillian gave X a hard way to go. He said that it was him, another person and X, and that they went into the house and Lillian didn't want to give up any stuff and X told him, Wayney, to grab her, and then he

grabbed her and held her while another person tied her up. He said that X strangled her.

N.T., 11/21/1995, p. 24–25. In this portion of the statement, Appellant's name was substituted with "X".

Detective Mangoni then took the stand to read the statement that Schneyder gave at the police station.[16] Detective Mangoni read, in pertinent part,

Question: Nicole, do you have any knowledge concerning her [Gaines'] murder?

Response: Yeah. On Thursday the day before she was killed X, they call him X.

N.T., 11/21/1995, p. 64. Appellant's counsel immediately objected to the redacted testimony on the basis that the jury was informed that "X" was Appellant. *Id.* at 64–66. The court then gave the Commonwealth the opportunity to correct the statement. Detective Mangoni then read the statement as it should have been read in the first instance, without the redaction, so that it read as follows:

Question: Nicole, do you have any knowledge concerning her [Gaines'] murder?

Response: Yeah. On Thursday the day before she was killed Michael Overby, they call him Hickey, and me were talking in his car. . . .

*Id.* at 66–67.

When Detective Mangoni read that portion of the police statement containing Elliott's hearsay statement, Appellant's name was changed to "A" instead of "X". During the jury instructions, the court instructed the jury that "under the United States Constitution, each person who's on trial has a right to face his accuser, so, therefore, a statement made by a person is only evidence against that person who made the statement, not against anybody else." N.T., 11/22/1995, p. 26.

16. As noted *infra* on page 299, Appellant's counsel initially joined the objection raised by Elliott's counsel to the admission of Detective Mangoni's reading of the statement. N.T., 11/21/1995, pp. 13–15. However, when given the choice of either renewing his objection to Mangoni's testimony or calling Nicole Schneyder to the stand, counsel chose not to object to Mangoni's testimony. *Id.* at 51–52.

As noted above, the jury could not decide on a verdict with regard to the first-degree murder charge, so the court declared a mistrial and scheduled a retrial.

At the second trial, a similar situation arose. Once again, the preliminary hearing testimony was read into the record, including Schneyder's recantation testimony and those portions containing the prior statement Schneyder made to Detective Mangoni. Appellant's name, in the portion of the statement containing Elliott's hearsay statement, was changed to "X." The following day, over defense counsel's objection, Detective Mangoni assumed the stand and read the statement Schneyder gave at the police station.[17]  N.T., 7/12/1996, pp. 4–7.  He stated, "the day before she was killed, X, they call him Hickey, and me were talking in his car."  N.T., 7/12/1996, p. 22.  At this point, counsel objected, and the court instructed the jury that Schneyder's statement could only be used to show that she might have said something different on a former occasion.  *Id.* However, the court never gave the jury a general confrontation instruction as it did in the first trial, i.e., that Elliott's statement could only be used as evidence against the person who made the statement.  Once more, when Detective Mangoni read that portion of the statement that incorporated Elliott's hearsay statement, Appellant's name was changed to "A."

In order to discuss Appellant's arguments fully, we must consider the alleged errors at each trial separately.  At the first trial, both prior statements were attributed to Schneyder.  Schneyder's preliminary hearing testimony provided that she was going to be questioned about the statement she gave to Detective Mangoni on January 24, 1992.  Detective Mangoni testified that he was going to read the statement that Schneyder gave him on January 24, 1992.  Thus, the jury knew that the statements admitted at both points in the trial were

17. At the second trial, Appellant's counsel clearly objected to Mangoni's reading of Schneyder's statement and this time, counsel was not faced with the Hobson's choice of calling Schneyder to the stand or not objecting to the admission of Mangoni's testimony, thus, unlike the first trial, counsel's objection continued at the time that Mangoni actually testified.

identical. Based upon this, when the jury heard Detective Mangoni read Schneyder's statement for the second time, the "X" clearly referred to Appellant since the statement was identical to the statement attributed to him in Schneyder's previous statement. This error was compounded when, immediately after counsel's objection, Detective Mangoni read the same part of the statement, this time replacing the "X" with Appellant's name. At this point, the jury could surmise that "X" referred to Appellant. Additionally, Elliott's hearsay statement was "powerfully incriminating" as it implicated Appellant directly in the crimes in question. Thus, unlike the situation in *Marsh,* the jury could reasonably infer from the face of the statements that Elliott was referring to Appellant in violation of *Bruton* and this was the kind of inference that a jury could make immediately.

Moreover, while it is impossible to divine whether the jurors definitely knew that "X" and "A" referred to the same person or whether the jurors were simply confused by the alteration of the statement, we must conclude that based upon the similarity of the statements a reasonable juror would understand that the letter "X" referred to the same person as the letter "A". Once the statements established that "X" or "A" was Appellant, the Confrontation Clause was violated. The only possible way to correct such a violation was to give Appellant the opportunity to cross-examine Elliott regarding the statement. *Bruton.* Appellant did not have such an opportunity and thus, we must conclude that the admission of the statement as redacted violated Appellant's right of confrontation pursuant to *Bruton.*

A similar analysis applies to the second trial. However, the error at the second trial was even more egregious. First, the jury was apprised that "X" was Hickey when Detective Mangoni read Schneyder's police statement. Appellant was identified as Hickey throughout the trial. N.T., 7/10/1996, pp. 90, 94, 167; N.T., 7/11/1996, pp. 7, 50. Thus, without even referring to the other statements, the jury was informed that "X" was Appellant and the redaction failed to prevent the statement from incriminating Appellant. *Miles.* This error was

aggravated by the fact that the trial court never instructed the jury that Elliott's statement was only admissible against the declarant/Elliott and could not be considered in the case against Appellant. Accordingly, we must find that the admission of the statement during both trials, as redacted, violated Appellant's right of confrontation as defined by *Bruton* and thus, any limiting instruction was simply insufficient to cure the prejudice to Appellant.[18]

Having concluded that the court erred in the manner in which the statements were redacted, we must necessarily consider whether such error was harmless. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *see also Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the

**18.** The United States Supreme Court has not had the opportunity to rule on whether non-custodial statements, such as the ones at issue here, are subject to the rule in *Bruton*. The Court has repeatedly indicated that custodial statements, such as confessions, are inherently unreliable because of the coercive nature of the statement, i.e., the circumstances surrounding the making of such statements, the motivation to lie, etc. *Lee*, 476 U.S. at 541, 106 S.Ct. 2056; *Bruton*, 391 U.S. at 141, 88 S.Ct. 1620. A corollary to this analysis is that non-custodial statements are reliable, since they are not made under such circumstances. Thus, some federal courts have not employed a Confrontation Clause analysis to bar hearsay statements of accomplices where the hearsay statement was made in a non-custodial setting to a friend or intimate. *United States v. Shea*, 211 F.3d 658 (1st Cir.2000); *United States v. Robbins*, 197 F.3d 829 (7th Cir.1999); *Latine v. Mann*, 25 F.3d 1162 (2nd Cir.1994); *but see United States v. Schmick*, 904 F.2d 936 (5th Cir.1990); *Monachelli v. Warden, SCI Graterford*, 884 F.2d 749 (3rd Cir.1989).

Nevertheless, the Court has failed to indicate that the Confrontation Clause should not apply to these statements. *But see Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)(plurality opinion)(although concluding that hearsay was admissible pursuant to the co-conspirator exception to the hearsay rule, language contained therein implies that the statement was reliable because of the non-custodial nature of the circumstances surrounding the making of the statement). Further, we are reluctant to adopt a general posture declaring such non-custodial statements reliable when they are made to a friend or intimate. Indeed, a declarant may have similar motives for inculpating a co-defendant/accomplice more than himself in situations where he is making such a statement to a friend or intimate.

erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 350 (1998) (citations omitted); *see also Schneble,* 405 U.S. at 430, 92 S.Ct. 1056. It is well established that an error is harmless only if the appellate court is convinced beyond a reasonable doubt that there is no reasonable possibility that the error could have contributed to the verdict. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978); *see also Commonwealth v. Ardestani,* 558 Pa. 191, 736 A.2d 552, 556 (1999). This is a burden that the Commonwealth must carry. *Commonwealth v. Young,* 561 Pa. 34, 748 A.2d 166, 193 (1999)(*citing Commonwealth v. Mayhue,* 536 Pa. 271, 639 A.2d 421 (1994)).

It is clear that the admission of Elliott's hearsay statement, as redacted, prejudiced Appellant. Elliott's statement provided that "X" strangled Gaines and the jury could infer that "X" was Appellant. Thus, the statement clearly implicated Appellant in the crimes charged. Indeed, such evidence provided the only direct evidence of Appellant's participation in the criminal episode. Thus, any prejudice arising from the admission of the statement could not be de minimis.

Further, such evidence was not merely cumulative of other properly admitted evidence. As referenced above, Elliott's statement provided the only direct evidence of Appellant's participation in the crime. While testimony established Appellant's presence outside of the crime scene, at or around the time in question, such evidence was merely circumstantial and did not establish that Appellant committed the crimes in question. Similarly, while testimony established Appellant's intent to rob someone, such testimony might not automatically lead a jury to conclude that Appellant robbed Gaines on the morning in question.

■   Lastly, the remaining evidence did not overwhelming-
ly establish Appellant's guilt.  The evidence demonstrated
Appellant's presence outside the crime scene, his relationship
to Gaines, and suggested that there was a disagreement
between Appellant and Gaines.  However, this evidence was
merely circumstantial.  While we acknowledge that circum-
stantial evidence can be sufficient to convict a defendant of a
crime, including first degree murder, in this case, Elliott's
erroneously redacted statement could have been the evidence
that prompted the jury to convict Appellant of the crimes in
question.  Thus, we cannot conclude that the properly admit-
ted and uncontradicted evidence of guilt was so overwhelming
and the prejudicial effect of the error so insignificant that the
error could not have contributed to the verdict.

Accordingly, for the reasons stated herein, we reverse the
judgment of sentence and remand this matter for a new trial
as to all charges.[19]

Former Chief Justice FLAHERTY did not participate in
the decision of this case.

Justice NEWMAN files a concurring opinion in which Chief
Justice ZAPPALA joins.

Justice CASTILLE files a dissenting opinion.

Justice NEWMAN, concurring.

I agree with the lead opinion that the proper ultimate
disposition of this case is to reverse the Judgment of Sentence
imposed by the Court of Common Pleas of Philadelphia Coun-
ty and remand the matter to the court for a new trial.
However, I write separately to express my evolving concerns
with trying multiple defendants in the same proceeding when
one or more, but not all, of the defendants have given a
statement or statements to the police, which can be classified
as confessionary.  After much reflection on this issue, I now

19.  After due consideration of the impassioned response by the dissent-
      ing opinion, we continue to adhere to our initial position that the issue
      of trial court error was fairly encompassed in Appellant's brief to this
      court and that we are not raising the issue *sua sponte*.  *See infra* n. 12.

believe that in all cases where there are multiple defendants, where one or more of the defendants has given a confession-ary statement, where one or more of the defendants who gave confessionary statements will not testify, and where the Commonwealth plans to introduce the confessionary statement(s), the trial should be severed to avoid any possibility of running afoul of the Confrontation Clause. The only limitation I would place on this proposition is that where there is no chance that the confessionary statement will prejudice the non-confessing co-defendant, it may be admitted and separate trials are not necessary.

The cornerstone case on the Confrontation Clause in this context is *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in which the U.S. District Court for the Eastern District of Missouri tried Bruton and Evans together for armed postal robbery. St. Louis police officers questioned Evans, who was incarcerated in the city jail in St. Louis, Missouri, awaiting trial on state criminal charges, about his involvement in the postal robbery. The officers obtained a confession from Evans, but did not give Evans any *Miranda*[1] warnings. The officers informed a postal inspector of their success with Evans; on two subsequent dates, the postal inspector questioned Evans, who again confessed and, during the second round of questioning, expressly implicated Bruton in the crime. The court permitted the prosecution to intro-duce the testimony of the postal inspector on Evans' confes-sion, but instructed the jury that they could only consider the confession against Evans, as "it was inadmissible hearsay against [Bruton] and therefore had to be disregarded in determining [Bruton's] guilt or innocence." *Bruton*, 391 U.S. at 125, 88 S.Ct. 1620. The jury convicted both Bruton and Evans of the crime.

Bruton and Evans appealed to the Court of Appeals for the Eighth Circuit, which vacated the conviction of Evans because "the confessions before the jury were tainted and infected by the poison of the prior, concededly unconstitutional confession

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

obtained by the local officer." *Evans v. United States,* 375 F.2d 355, 361 (8th Cir.1967). However, the Eighth Circuit affirmed the conviction of Bruton based on the limiting instruction given by the trial court. Bruton sought leave to appeal to the United States Supreme Court, which granted *certiorari* to determine "whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence." *Bruton,* 391 U.S. 123–124, 88 S.Ct. 1620, 20 L.Ed.2d 476. The Court determined that, "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt, admission of Evans' confession in this joint trial violated [Bruton's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126, 88 S.Ct. 1620.

The Court reasoned as follows:

Here the introduction of Evans' confession posed a substantial threat to [Bruton's] right to confront the witnesses against him, and this is a **hazard we cannot ignore.** Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating [Bruton], in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [Bruton's] constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

*Id.* at 137, 88 S.Ct. 1620 (emphasis added). In a Concurring Opinion, Justice Stewart opined that a "basic premise of the Confrontation Clause . . . is that certain kinds of hearsay are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, whatever instructions the trial judge might give." *Id.* at 138, 88 S.Ct. 1620 (Stewart, J., concurring) (internal citations omitted).

Justice White dissented, arguing that irrespective of the admissibility of Evans' confession as against Evans, "nothing in that confession which was relevant and material to Bruton's

case was admissible against Bruton. As to Evans, it was inadmissible hearsay, a presumptively unreliable out-of-court statement of a nonparty who was not a witness subject to cross-examination." *Id.* at 138, 88 S.Ct. 1620 (White, J., dissenting). However, Justice White would have upheld the conviction of Bruton, reasoning as follows: "Just as the Court believes that juries can reasonably be expected to disregard ordinary hearsay or other inadmissible evidence when instructed to do so, I believe juries will disregard the portions of a codefendant's confession implicating the defendant when so instructed." *Id.* at 142, 88 S.Ct. 1620. Justice White believed that the majority had "severely limit[ed] the circumstances in which defendants [could] be tried together for a crime which they [were] both charged with committing." *Id.* at 143, 88 S.Ct. 1620.

Justice White criticized the position of the majority as creating a potentially unfair criminal justice system in which separate trials could have vastly different consequences for "legally indistinguishable defendants." *Id.* Justice White explained his conception of what the majority had done as follows:

> I would suppose that it will be necessary to exclude all extrajudicial confessions unless all portions of them which implicate defendants other than the declarant are effectively deleted. **Effective deletion will probably require not only omission of all direct and indirect inculpations of codefendants but also of any statement that could be employed against those defendants once their identity is otherwise established.** Of course, the deletion must not be such that it will distort the statements to the substantial prejudice of either the declarant or the Government. If deletion is not feasible, then the Government will have to choose either not to use the confession at all or to try the defendants separately.

*Id.* at 143–144, 88 S.Ct. 1620 (emphasis added). Justice White suggested that "[t]o save time, money, and effort, the Government might best **seek a ruling at the earliest possible stage of the trial proceedings** as to whether the confession is

admissible once offending portions are deleted." *Id.* at 144, 88 S.Ct. 1620 (emphasis added).

While I am mindful of the concerns articulated by Justice White in his dissent in *Bruton* regarding the practical difficulties of the separate trials and the potential of varying consequences for legally indistinguishable defendants, I agree with his reading of the Majority Opinion in that case. This Court seemed to read *Bruton* consistently with that view as well. *See Commonwealth v. Johnson,* 474 Pa. 410, 378 A.2d 859, 860 (1977) ("If a confession can be edited so that it retains its narrative integrity and yet **in no way refers to defendant,** then use of it does not violate the principles of *Bruton* ") (emphasis added). In *Johnson,* the trial court rejected a statement that did not mention Johnson by name, but instead utilized the pronoun "we". The trial court ruled that the reference had to be deleted, reasoning that any reference that by "any stretch of the imagination" could refer to Johnson, had to be omitted. *Id.* at 861.

Muddying the waters in this difficult field of criminal jurisprudence is *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Marsh,* over the objection of Marsh, a Michigan state court tried Williams, Martin, and Marsh jointly for two murders and an assault. The prosecution introduced a confession given by Williams to the police, in which Williams referred to both Martin and Marsh. The confession detailed a conversation that the three co-defendants had had in a car before the murders. When introducing the confession at trial, the prosecutor redacted the confession to omit all references to Marsh and all references that anyone other than Williams and Martin were involved in the crime. Even though the confession did not refer in any way to Marsh, the court read to the jury an instruction admonishing them not to use the confession against Marsh. Marsh took the stand in her own defense and testified that she was in the car, but that she could not hear the conversation between Williams and Martin because the radio was too loud.

Later, during its closing argument, the prosecution linked Marsh's testimony to the confession of Williams as follows:

"It's important in light of [Marsh's] testimony when she says [Martin] drives over to [Williams'] home and picks him up to go over. What's the thing that she says? 'Well, I'm sitting in the back seat of the car.' 'Did you hear any conversation that was going on in the front seat between [Martin] and [Williams]?' 'No, couldn't hear any conversation. The radio was too loud.' I asked [sic] you whether that is reasonable. Why did she say that? Why did she say she couldn't hear any conversation? She said, 'I know they were having conversation but I couldn't hear it because of the radio.' Because if she admits that she heard the conversation and she admits to the plan, she's guilty of at least armed robbery. So she can't tell you that."

*Id.* at 205, n. 2, 107 S.Ct. 1702 (quoting Notes of Testimony from the original trial). Defense counsel for Marsh did not object to this statement. The jury convicted Marsh of the crimes, the Michigan Court of Appeals affirmed, and the Michigan Supreme Court refused to consider Marsh's appeal. Marsh then sought *habeas corpus* relief, which the District Court for the Eastern District of Michigan denied. However, the Court of Appeals for the Sixth Circuit reversed, "reject[ing] the approach which limits the appraisal of the inculpatory value of an extrajudicial statement to the face of the statement itself. Such an approach ignores the true incriminatory effect of the statement, and, with no countervailing benefit, sanctions the use of admittedly inadmissible evidence...." *Marsh v. Richardson,* 781 F.2d 1201, 1212 (6th Cir.1986). Accordingly, the Sixth Circuit held that the statement of the prosecutor linking Marsh to the Williams confession violated the Confrontation Clause. The United States Supreme Court granted *certiorari* to address how *Bruton* applies to situations where the confession does not refer to the co-defendant.

The Court noted the distinction between *Bruton* and *Marsh,* in that the confession in *Bruton* "expressly implicated" Bruton as the accomplice of the confessing co-defendant. *Richardson v. Marsh,* 481 U.S. at 208, 107 S.Ct. 1702. The Court held that "the Confrontation Clause is not violated by the admis-

sion of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S.Ct. 1702. The Court refused to rule "on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at 211, n. 5, 107 S.Ct. 1702.

Justice Stevens, joined by Justices Brennan and Marshall, filed a vigorous dissent, in which he argued that, pursuant to *Bruton,* there should be no distinction between "confessions that directly identify the defendant and those that rely for their inculpatory effect on the factual and legal relationship of their contents to other evidence before the jury." *Id.* at 212, 107 S.Ct. 1702 (Stevens, J., dissenting). Justice Stevens wrote that, in his opinion, not all co-defendant confessions expressly mentioning the defendant should be excluded or require separate trials because some do not serve to prejudice the defendant. However, where the confession of the co-defendant is "powerfully incriminating" and would, thus, prejudice the defendant, whether expressly or only by reference to other evidence, admission of the confession creates a "substantial . . . and constitutionally unacceptable risk that the jury, when resolving a critical issue against [Marsh], may have relied on impermissible evidence." *Id.* at 214, 216–217, 107 S.Ct. 1702.

Responding to the concern that separate trials waste judicial resources and lead to vastly different consequences for legally indistinguishable defendants, the *Marsh* dissent stated:

The facts that joint trials conserve prosecutorial resources, diminish inconvenience to witnesses, and avoid delays in the administration of criminal justice have been well known for a long time. It is equally well known that joint trials create special risks of prejudice to one of the defendants, and that such risks often make it necessary to grant severances. The Government argues that the costs of requiring the prosecution to choose between severance and not offering the codefendant's confession at a joint trial outweigh the benefits to the defendant. On the scales of justice, however,

considerations of fairness normally outweigh administrative concerns.

\* \* \*

The [majority] expresses an apparently deep-seated fear that an even-handed application of *Bruton* would jeopardize the use of joint trials. This proposition rests on the unsupported assumption that the number of powerfully incriminating confessions that do not name the defendant is too large to be evaluated on a case-by-case basis. The Court then proceeds to the ostensible administrative outrages of the separate trials that would be necessary, contending that it would be unwise to compel prosecutors to bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. This speculation also floats unattached to any anchor of reality. Since the likelihood that more than one of the defendants in a joint trial will have confessed is fairly remote, the prospect of presenting the same evidence again and again is nothing but a rhetorical flourish. At worst, in the typical case, two trials may be required, one for the confessing defendant and another for the nonconfessing defendant or defendants. And even in that category, presumably most confessing defendants are likely candidates for plea bargaining.

*Id.* at 217, 219, n. 7, 107 S.Ct. 1702 (internal quotations and citations omitted).

I agree with Justice Stevens' dissent in *Marsh;* the goal of our system of criminal justice is to ensure that criminal defendants receive fair trials. Administrative concerns, while uncontrovertibly important, must not work to deprive a defendant in jeopardy of losing his or her life or liberty from his or her fundamental right to cross-examine adverse witnesses. In fact, I would go a step farther than Justice Stevens. I believe that if a confessionary statement has the potential to prejudice a non-confessing defendant, the trial should be severed, even if

the confession is not "powerfully incriminating." It is potentially equally wasteful of judicial resources to permit a joint trial in these situations for the reason that a mid-trial severance or reversal on appeal expends the resources of a court much more than utilizing separate trials from the outset. This consideration, coupled with the potential unfairness to a criminal defendant in a joint trial, leads this Justice to the conclusion that where a confessionary statement of one or more nontestifying co-defendants has the potential to prejudice a nonconfessing co-defendant, the trial of the non-confessing codefendant should proceed separately.

In the case *sub judice*, the prosecutor read the preliminary hearing testimony of Schneyder in open court. At the first trial, the Commonwealth read Schneyder's preliminary hearing testimony to the jury:

[Response continued]: He [Elliott] said that Lillian opened the door and he said that Lillian gave X a hard way to go. He said that it was him, another person and X, and that they went into the house and Lillian didn't want to give up any stuff and X told him, Wayney, to grab her, and then he grabbed her and held her while another person tied her up. He said that X strangled her.

Notes of Testimony, 11/21/1995, at 24–25. At the second trial, in the portion of the statement containing Elliott's hearsay statement, the name of Michael Overby (Overby) was again changed to "X." As the lead opinion notes, the jury was clearly aware that "X" referred to Overby. This statement undoubtedly prejudiced Overby. Accordingly, as does the lead opinion, I would reverse the Judgment of Sentence and remand the matter for a new trial on all counts.

Chief Justice ZAPPALA joins in this concurring opinion.

Justice CASTILLE, dissenting.

The Court's grant of a new trial today under authority of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), results from a misapprehension of the material facts; a troubling application of this Court's already-embattled relaxed waiver practice to reach a fictional claim the

Court perceives *sua sponte;* a consequent imposition of a burden of proof upon the appellee which it could not possibly have foreseen and which the Court affords the appellee no opportunity even to attempt to discharge; and, finally, a misapprehension of the Sixth Amendment Confrontation Clause jurisprudence that governed at the time of the 1995–1996 trials in this matter, which necessarily calls into question the continuing vitality of this Court's recent decision in *Commonwealth v. Lopez,* 559 Pa. 131, 739 A.2d 485 (1999). I am compelled to respectfully dissent.

The Court goes to rather extraordinary lengths to overturn the verdict in this capital case. First, rather than review the relevant claim of ineffective assistance of trial counsel which is actually forwarded and argued by the parties, the Court invokes the relaxed waiver practice to *sua sponte* **convert** that issue into a claim sounding in trial court error under *Bruton.* The Court then declares that the *Bruton* issue it prefers to decide was preserved by contemporaneous objection below, when the record conclusively demonstrates that it was not. By *sua sponte* altering the issue actually raised and briefed by the parties in favor of its own waived issue, the Court imposes a new and unforeseeable burden upon appellee, the Commonwealth, to prove harmless error beyond a reasonable doubt. Yet the Court affords the Commonwealth no opportunity even to attempt to carry the retroactive burden imposed upon it. Having dispensed with actual advocacy from the parties on the dispositive issue it raises, the Court plows ahead and ultimately concludes that the Commonwealth failed to carry its unknowable burden. Although appellate courts have the power to **affirm** judgments below for reasons of record not forwarded by the parties, the Court today takes the extraordinary step of **reversing** a capital judgment upon an issue neither raised here nor preserved below.

Having devised its own claim of "trial court error" under *Bruton,* altered the review standard, reversed the ultimate burden to prove prejudice, and then proceeded in its solipsistic course unfettered by what actually occurred at trial below and is actually raised on appeal, the Court's substantive resolution

of the *Bruton* claim is, predictably enough, problematic. In holding that co-defendant Dwayne Elliott's redacted statement is defective under *Bruton*, the Court does not look at the face of the statement—despite the fact that the Court purports to recognize that such is the required analysis under the state of *Bruton* law in trials such as these, which predated *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998)—but instead engages in speculation on what the juries might have surmised or inferred from **other evidence** introduced at the trials. By looking to evidentiary inferences or "contextual implications" outside Elliott's redacted statement to resolve its *Bruton* claim, the Court retroactively applies the analytical approach pioneered in *Gray*—notwithstanding that this Court has already held that *Gray* established a new constitutional rule that should not be applied retroactively. *See Commonwealth v. Lopez, supra.*

If the Court were to overrule *Lopez* and state that it was applying *Gray* retroactively in granting relief, its analytical approach would possess the virtue of internal consistency. The decision would still be wrong—since no *Bruton* claim was even preserved for retroactive application and since *Gray* obviously established a new constitutional rule—but it would at least be internally consistent. Unfortunately, the Court's approach introduces both inconsistency and uncertainty into the status of pre-Gray Bruton law in Pennsylvania. The Court cannot have it both ways: if it is pre-*Gray* law that applies, as the Court says, then the analysis of the propriety of the non-objected-to redaction here is limited to the statement. And, since appellant does not go by the name of "Mr. A" or "Mr. X," Elliott's redacted statement, which contains no references to appellant by name (or even by nickname), obviously was acceptable in 1995 and 1996. Indeed, the manner in which Elliott's statement was redacted is materially identical to redactions that were approved by this Court in decisions that were contemporaneous with the trials in this matter. That fact, no doubt, explains why trial counsel, who had to try this case without the luxury of *Gray*-based hindsight, raised no objection.

The effect of the Court's nimble reconstitution of the records and the issue presented, its reduction of the advocates' briefs to irrelevancies, and its facility in massaging the governing law with the liniment of its future insight, is an unnecessary, revisionist, and erroneous *Bruton* holding. When all of its alchemy is said and done, the Court essentially holds that, at the time of appellant's trials in 1995 and 1996— *i.e.*, years before *Gray* was argued or decided and at a time when *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) was the U.S. Supreme Court's most recent pronouncement on *Bruton*—U.S. Supreme Court decisional law **dictated** that it was **improper** to employ a symbol such as "X" in place of the defendant's name, when redacting a non-testifying co-defendant's confession for *Bruton* purposes.

The lead opinion holds that the trial court "erred" under *Bruton* when it supposedly admitted into evidence at both trials, via the preliminary hearing testimony of an unavailable witness, the statement of appellant's co-defendant, Elliott, which had originally named appellant as the person who strangled the victim, but which was redacted to substitute the letters "X" or "A" whenever appellant's name appeared. As redacted, Elliott's statement, on its face, did not implicate appellant in the slightest. The statement requires inferences from or linkage to other evidence at the trials detailing appellant's role in the murder to reveal that the "X" or "A" referred to in the statement was appellant. Although the redaction here was not so obvious an alteration as that at issue in *Gray* (where either the word "deleted" or a blank space was substituted for the defendant's name), I do not dispute that the redaction would be problematic under the reasoning employed in the 5–4 majority decision in *Gray*. Thus, if appellant had anticipated and preserved a *Gray* claim which the trial court had overruled, and if *Gray* applied retroactively, the trial court may well have "erred" in admitting Elliott's statement. But, in addition to the fact that this Court held in *Lopez* that *Gray* does not apply retroactively, appellant in point of fact **never** objected that the form of redacting Elliott's statement violated *Bruton*, much less did he anticipate *Gray;*

*i.e.,* he never argued that the substitution of letters for his name facially incriminated him in the same way as the use of the defendant's proper name in *Bruton,* even though it required inference or linkage by the jury to draw the incriminating connection.

To the extent that the lead opinion states that trial counsel "objected to the admission of [Elliott's] statement and then also objected to the redaction," and thereby preserved "the question of trial court error" under *Bruton,* op. at 300 n. 12, it has misapprehended the record, for no such objection was forwarded. It appears that the Court has confused Elliott's redacted statement with the police statement of witness Nicole Schneyder, which included an account of a conversation she had with appellant on the day before the murder. At both trials, appellant objected not to the alteration of co-defendant **Elliott's** statement, but to the alteration of **Schneyder's** statement. Schneyder's statement had been introduced during her testimony at the preliminary hearing, where she was subject to cross-examination. Schneyder recanted by the time of the first trial, however, and therefore her preliminary hearing testimony, which included the account of the conversation with appellant which was included in her police statement, was introduced at both trials through the testimony of Detective Dominic Mangoni.

In reciting Schneyder's preliminary hearing testimony, the detective inadvertently substituted the letter "X" for appellant's name and nickname in Schneyder's police statement accounting for her conversation with appellant. *See* N.T. 11/21/95, p. 64–66; N.T. 7/12/96, p. 22. In short, the detective, perhaps wrongly assuming that since Elliott's statement had been redacted to remove references to appellant, Schneyder's needed to be altered too, effectively "redacted" Schneyder's testimony and account. Appellant's trial counsel, who was obviously alert to this, objected because the detective's "redaction" of **witness Schneyder's statement** "filled in the equation for the jury," N.T. 11/21/95, p. 64—*i.e.,* it could lead the jury to infer that Elliott in fact was referring to appellant when the letter "X" was used in his redacted statement. The potential

harm was more obvious because, after the objection, the detective corrected himself and re-read Schneyder's testimony to refer to appellant by name and nickname, rather than by the letter "X."

Thus, the nature of the objection actually lodged by appellant at these trials was not that co-defendant **Elliott's** statement was improperly redacted under *Bruton* because the letter "X" was used, as the Court now mistakes, but rather that the statement of unavailable witness **Schneyder,** who had been subject to cross-examination, was erroneously altered by the detective and that appellant was prejudiced because that alteration could lead the jury to connect appellant to the "X" referred to in Elliott's statement, even though Elliott's statement was not introduced against appellant. Appellant's actual objection, thus, did not have to do with *Bruton* or the adequacy of the redaction of Elliott's statement at all. The objection to Mangoni's rendering of Schneyder's testimony was effectively identified and forwarded by trial counsel and certainly warranted a response from the trial court. But it is not the ineffective assistance of counsel claim appellant now raises, which assails counsel for failing to object to the redaction of Elliott's statement under *Bruton,* and it is decidedly not the claim of *Bruton* trial court error that the lead opinion raises *sua sponte,* which assails the trial court for allegedly "admitting" Elliott's improperly redacted statement. Moreover, unlike the issue the Court formulates, the claim that trial counsel raised was one that bears some relationship to what actually occurred at trial, and counsel's objection led to an immediate response from the trial court. Thus, immediately after appellant objected to Mangoni's substitution of the letter "X" for appellant's name and nickname in Schneyder's statement at the second trial, the trial court instructed the jury as follows:

Members of the jury, when a statement is read by someone, it is evidence against that person only. There is a witness who is out of court and it's bringing in for a very limited purpose, just to see whether or not it's different than the way she testified at the first hearing, that's all. So with that, I'll permit the proceeding to go forward.

N.T. 7/12/1996, at 22. Apparently satisfied with this response, trial counsel did not object to the adequacy of this charge under *Bruton*, or propose a different or supplemental charge.[1]

I assume that the redaction of **Elliott's statement,** as opposed to the redaction of Schneyder's testimony which the Court has apparently confused with Elliott's statement, was either undertaken by the prosecutor with the input of appellant's trial counsel, or that trial counsel saw no legitimate issue arising from the prosecutor's proposed redaction. Whatever may have been the circumstances surrounding the redaction, the simple, indisputable and unavoidable fact is that no issue involving its adequacy under *Bruton* was ever raised before the trial court, such that the trial court was called upon either to approve or disapprove the alteration. Thus, the unequivocal answer to the metamorphosed question *sua sponte* raised by the lead opinion—Did the trial court err in "admitting" the redacted statement?—can only be, "No, it did not."

The trial judge is not an advocate, but a neutral arbiter interposed between the parties and their advocates, guiding the course of the trial, and deciding the legal issues that are brought to his attention by the parties through timely and proper motions, objections, and argument. With certain rare exceptions—none of which are involved here—the trial judge is not duty-bound to raise additional arguments on behalf of one party or another such that, if and when the judge fails to do so, he has "erred." In those instances where the law does not require the judge to take some affirmative action, and the issue is not raised before the judge, there cannot have been any "trial court error." In our system of jurisprudence, the "error" which arises from foregone objections and arguments,

1. At the first trial, the trial court issued a general *Bruton* charge at the end of the case. N.T. 11/22/1995, p. 26. This Court has indicated that the preferable practice is to give the charge sooner, as occurred at the second trial. *Commonwealth v. Covil*, 474 Pa. 375, 378 A.2d 841, 845 (1977) ("[Although a] limiting instruction may be given either as the evidence is admitted or as part of the general charge .... [w]e emphasize ... that it is better to give the limiting instruction at the time the evidence is admitted.") (citations omitted). At neither trial did appellant object to the timing or adequacy of the court's remedial response to the objection to Mangoni's testimony.

if there is one, rests with the belatedly aggrieved party who failed to bring the matter to the judge's attention. Unlike the lead opinion and the concurrence, appellant understands this fundamental truth; that is obviously why he raises his *Bruton* claim exclusively under the rubric of counsel ineffectiveness.

I believe that our review of alleged "errors" made by trial judges should be confined to their actual decisions and to the known and knowable legal principles which actually governed at the time of trial. One could surmise that most trials would be deemed rife with reversible trial court error if reviewing courts blithely suspended principles of issue preservation and ignored principled limitations governing the retroactive application of future decisions. Given the ever-changing landscape in micro-managed capital cases,[2] there probably is not a capital trial in the land that could survive a scrutiny conducted in the hindsight of future decisions. But no rational system of review can operate in such a back-to-the-future fashion. The Court's reversal of the judgment below on the basis of a non-existent and non-raised error calls to mind why we abrogated fundamental error review almost thirty years ago, *i.e.*, because that theory "never developed into a principled test, but has remained essentially a vehicle for reversal when the predilections of a majority of an appellate court are offended." *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114, 116–17 (1974).

The Court's profound error in detecting a preserved *Bruton* claim where none exists is compounded by its torturing of the appellate pleadings in order to reach that non-existent claim. I disagree with the Court's apparent belief that the relaxed waiver doctrine permits conversion of claims of trial counsel ineffectiveness into fictional claims of trial court "error" for failing to *sua sponte* raise novel claims on behalf of a party.

Unlike the Court, appellant's capable appellate lawyer, who is other than trial counsel, recognizes and asserts that appel-

2. *See Morgan v. Illinois*, 504 U.S. 719, 751, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J., dissenting) (adverting to "the fog of confusion that is our annually improvised Eighth Amendment, 'death is different' jurisprudence").

lant never objected to the manner in which Elliott's statement was redacted under *Bruton.* Indeed, counsel specifically and repeatedly frames his issue as one of trial counsel's ineffectiveness for **failing to object** to the manner of redaction and failing to seek severance. This framing of the issue, including the accurate factual averment that trial counsel did not object, is repeated in the Statement of Questions Involved, Appellant's Brief at 3; in the Summary of the Argument, *id.* at 23; in the Argument heading, *id.* at 41; in the actual Argument itself, *see, e.g., id.* at 45 ("Trial counsel was ineffective when he failed to object to the manner of redaction") and 48 (same); and in the conclusion to the Brief. *Id.* at 87.

In developing his distinct Sixth Amendment claim sounding in the right to effective counsel, appellant cites *Gray* as supposed proof of the inadequacy of the redaction here, and also avers that the trial court "erred in the manner in which the [statements] were redacted." The latter statement is inaccurate since, as noted, the trial court did not perform the redaction of Elliott's statement and, as appellant concedes, trial counsel never objected to it. The inaccuracy is irrelevant to the claim appellant actually raises, however, since appellant's legal claim sounds in trial counsel's alleged ineffectiveness. It does not matter, for appellant's purposes, whether the redaction was accomplished by the court or the prosecutor, or even the parties in consultation; he faults trial counsel for failing to see to it that the statement was otherwise edited or excluded, or a separate trial secured. Of course, it is common to raise claims of counsel ineffectiveness in this fashion, *i.e.,* by focusing on an event at trial and questioning the objective reasonableness of counsel's handling of the issue. Appellant's claim of counsel ineffectiveness thus is cogent, focused and reviewable.

The Commonwealth, in an able response to which the Court blinds its eyes, joins the issue actually raised by appellant and seizes upon the flaw in appellant's relying upon the future decision in *Gray* to prove trial counsel ineffective. Thus, the Commonwealth cites settled law and argues that counsel cannot be deemed ineffective for failing to anticipate Gray.

*See, e.g., Lopez,* 739 A.2d at 499 n. 18; *Commonwealth v. Fowler,* 550 Pa. 152, 703 A.2d 1027, 1029 (1997). In this regard, the Commonwealth accurately notes that, at the time of the trials here, this type of redaction was permissible under the decisions of the U.S. Supreme Court and of this Court, so long as a *Bruton* instruction accompanied the redaction.

The Court concedes that appellant states his claim as one of counsel ineffectiveness, but converts it into one of trial court error notwithstanding, by asserting that, "in the argument portion of his brief [appellant] also raises and develops the assertion that the trial court erred in admitting the statements given the manner in which they were redacted [and] in light of [a]ppellant's full development of this issue in a direct capital appeal matter, it is unnecessary to address the issue in terms of trial counsel's ineffectiveness." Invoking this Court's amorphous direct capital appeal relaxed waiver practice, the lead opinion concludes that "it would be inappropriate . . . to decline review of the issue related to the alleged trial court error, merely on the basis of what amounts to appellant's awkward phrasing of the Statement[ ] of Questions Involved." Op. at 300 n. 12.

This is a startling and rather implausible excuse for the Court's unilateral action here. Appellate counsel should not be erroneously accused of "awkward[ly] phrasing" his issue, much less should his appellate litigation decisions be *sua sponte* second-guessed, merely because the Court for some odd reason is more interested in a fictional claim it tortures from the record in order to retroactively apply future law. To repeat, the claim of trial court *Bruton* error that the Court conjures is not one that was available to appellate counsel as a preserved claim of error **because it was never raised in the court below.** Moreover, it was not raised below for obvious reasons: the *Gray* decision, which is essential to the Court's retrofitted inference/contextual approach to *Bruton,* did not yet exist. Counsel acted in a thoroughly responsible fashion in briefing his appellate claim in the only appropriate manner actually available.

Most claims of counsel ineffectiveness having to do with record matters at trial (as opposed to claims involving failures of investigation or preparation) necessarily are derivative of events at trial—*i.e.*, counsel is faulted for failing to object, or for failing to raise the most appropriate objection, etc. *Cf. Commonwealth v. (Craig) Williams*, 566 Pa.553, 782 A.2d 517, 525 n.5 (2001). This Court has routinely reviewed such claims of counsel ineffectiveness on direct appeal without *sua sponte* converting them into waived and fictional claims of alleged "trial court error." *See, e.g., Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069, 1083 (2001); *Commonwealth v. (Christopher) Williams*, 554 Pa.1, 720 A.2d 679, 685 (1998); *Commonwealth v. Howard*, 538 Pa. 86, 645 A.2d 1300, 1304 (1994).

Some better explanation for the Court's alchemy is demanded because whether a claim is reviewed as a claim of counsel ineffectiveness or is converted into a fictional claim of "trial court error" may be outcome-determinative. As Mr. Justice Cappy noted in *Howard:*

[A] defendant is required to show actual prejudice [in order to prevail on a claim of ineffective assistance of counsel]; that is, that counsel's ineffectiveness was of such magnitude that it "could have reasonably had an adverse effect on the outcome of the proceedings." ... This standard is different from the harmless error analysis that is typically applied when determining whether the trial court erred in taking or failing to take certain action. The harmless error standard ... states that "[w]henever there is a 'reasonable possibility' that an error 'might have contributed to the conviction,' the error is not harmless." This standard, which places the burden on the Commonwealth to show that the error did not contribute to the verdict beyond a reasonable doubt, is a lesser standard than the [ineffectiveness] prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel. In a collateral attack, we first presume that counsel is effective,

and that not every error by counsel can or will result in a constitutional violation of a defendant's Sixth Amendment right to counsel....

645 A.2d at 1307 (citations omitted). This distinction in the treatment of claims of error as opposed to claims sounding in a deprivation of counsel is not arbitrary, but rather is an ineluctable function of the essential difference between a preserved claim of trial court error, and a Sixth Amendment claim, not raised before, sounding in ineffective assistance of counsel.

As Mr. Justice Cappy's teaching in *Howard* also suggests, judicial conversion of a claim of counsel ineffectiveness into a fictional claim of trial court error has a practical effect on the parties—an effect that the Court today cavalierly ignores. In proceeding to award relief in this case, the lead opinion ultimately concludes that the Commonwealth failed to carry its burden of proving harmless error. Op. at 307. But the Commonwealth most likely had no clue that such a burden existed, since it understandably responded to the claim of counsel ineffectiveness that appellant actually raised, and not the fictional claim of "trial court error" that the Court has devised on appellant's behalf. Even in a capital case, the government should be entitled to fair treatment. Both as a matter of fundamental fairness and as a matter of ensuring quality appellate decision-making, when a court perceives and raises an issue *sua sponte* that alters the review standard and imposes a new and unanticipated burden on a party, the court should, at a minimum, permit the affected party an opportunity to address its new burden. A court looking at a cold record, without benefit of argument, lacks the trained eye of the interested advocate. Apparently, it never even occurs to the Court that the record upon harmless error review might appear differently if it had the benefit of actual advocacy on the dispositive question it has injected. The Court's alchemy has waylaid the Commonwealth and deprived it of an opportunity to be heard. The Commonwealth, like the "erring" trial court, simply falls victim to the Court's thunderbolt today.

The Court's issue conversion and faulting of the trial court for failing to *sua sponte* raise an issue are dire enough. What is worse is that, on the merits of the *Bruton* claim it raises, the Court evaluates the fictional "trial court error" not pursuant to the state of the law which governed at the time of appellant's trial, but in a fashion that obviously derives from the U.S. Supreme Court's subsequent decision in *Gray*. The lead opinion's survey of *Bruton* law is accurate so far as it goes. It notes that *Bruton* held that a defendant is deprived of his Sixth Amendment right of confrontation when a confession of a nontestifying co-defendant is introduced at their joint trial and **explicitly** names and powerfully incriminates the defendant, even if the jury is instructed to consider the confession only against the co-defendant; that, in *Richardson*, the Court declined to extend the *Bruton* rule to co-defendant confessions that incriminate the defendant only by inference or linkage to other evidence; and that, most recently, the *Gray* Court acknowledged that *Richardson* had placed statements that incriminate by mere inference entirely outside the scope of *Bruton*, but altered that analysis so that statements which, despite redaction, still "obviously refer directly to someone, often obviously the defendant, and involve inferences that a jury ordinarily could make immediately[,]" violate *Bruton's* protective rule. In addition, the lead opinion accurately notes that this Court's Confrontation Clause jurisprudence has been coterminous with federal law. Thus, in *Commonwealth v. Johnson*, 474 Pa. 410, 378 A.2d 859 (1977), this Court held that the Commonwealth may introduce into evidence the redacted statement of a non-testifying co-defendant at a joint trial so long as the statement does not expressly refer to the defendant. Also, prior to *Gray*, this Court had held in *Commonwealth v. Lee*, 541 Pa. 260, 662 A.2d 645 (1995), *cert. denied*, 517 U.S. 1211, 116 S.Ct. 1831, 134 L.Ed.2d 935 (1996) and again in *Commonwealth v. Miles*, 545 Pa. 500, 681 A.2d 1295 (1996) that the substitution of the letter "X" or a similar symbol for the defendant's name did not violate *Bruton*. (It should be noted that, although the lead opinion relies upon *Miles*, that decision was not handed down until July 31, 1996, which was **after** both trials in this case.)

Despite recognizing that, under pre-*Gray* law, co-defendant statements that incriminate only by inference fall outside the scope of *Bruton*, the lead opinion inexplicably holds that Elliott's redacted statement violates *Bruton* because it "expressly implicated [a]ppellant in the crime in violation of the Confrontation Clause." Op. at 303. This simply is not so. As redacted, Elliott's statement never referred to appellant by name or even by nickname; instead, the letters "A" or "X" were substituted for his name. A link to appellant could only be found by looking to other evidence at the trials which detailed the primary role appellant played in strangling Lillian Gaines. Tellingly, in finding that Elliott's statement "expressly implicated" appellant, both the lead opinion and the concurrence look not to the face of the statement, but instead to other events at these trials: specifically, Detective Mangoni's botched reading of **Schneyder's** preliminary hearing testimony. Thus, in reviewing the first trial, the lead opinion emphasizes that, when Mangoni read Schneyder's account of her conversation with appellant and inadvertently substituted the letter "X" for appellant's name, "the 'X' clearly referred to [a]ppellant since the statement was identical to the statement attributed to him in Schneyder's previous statement." Op. at 305. This error was compounded, the lead opinion reasons, when, immediately after counsel's objection to the Detective's lapse, Mangoni re-read the statement, this time replacing the "X" with appellant's name. On this record, the lead opinion determines that the jury could "surmise" or "reasonably infer"—*i.e.*, that the jury could conclude from context or inference or "evidentiary links"—that the "X" referred to in Elliott's statement was appellant, even though nothing in that statement *qua* statement remotely suggested any such thing. Continuing in its inference/evidentiary linkage analysis, the lead opinion next reasons that the error at the second trial, the trial which resulted in appellant's murder conviction, was even more egregious because the jury was apprised that "X" was "Hickey," appellant's nickname, when Mangoni read Schneyder's police statement, and appellant had already been identified as "Hickey" throughout that trial. *Id.*

In my view, the Court's finding of a *Bruton* violation based not upon the co-defendant's actual statement, but upon inferences that the juries may have drawn from other events at these trials is patently erroneous under the pre-*Gray* state of the law that prevailed when these trials were conducted. At that time, the most recent and governing U.S. Supreme Court decision was *Richardson.* In *Richardson,* although the co-defendant's confession was redacted to remove all reference to the defendant, the defendant still argued that admission of the co-defendant's confession violated her confrontation rights because it implicated her in the crime when linked with other evidence. As this Court recently noted in *Commonwealth v. Travers,* 564 Pa. 362, 768 A.2d 845, 848 (2001), the *Richardson* Court "expressly rejected the theory of contextual implication, recognizing the important distinction between co-defendant confessions that expressly incriminate the defendant and those that become incriminating only when linked to other evidence properly introduced at trial." In rejecting the theory, the *Richardson* Court noted that, when incrimination is merely inferential, "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." *Richardson,* 481 U.S. at 208, 107 S.Ct. 1702. Thus, **at the time these cases were tried,** if linkage with other evidence was required for the co-defendant's statement to incriminate the accused, a proper limiting instruction was sufficient to satisfy *Bruton.* Importantly for present purposes, the *Richardson* Court also was careful to express "no opinion" on the admissibility of a confession where the redaction consists of replacing the defendant's name "with a symbol or neutral pronoun." *Id.* at 211 n. 5, 107 S.Ct. 1702. That, of course, is the form of redaction that was employed, without objection below, here.

The High Court's subsequent decision in *Gray* expressly reaffirms that such was the state of pre-*Gray* law. The majority in *Gray* noted that its task was to "**decide a question that *Richardson* left open,** namely, whether redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word "deleted," **or a**

**similar symbol,** still falls within Bruton's protective rule." 523 U.S. at 192, 118 S.Ct. 1151 (emphases supplied). In ultimately holding, for the first time, that such a redaction did fall within *Bruton,* the Court candidly acknowledged the tension between that new holding and the previously prevailing law under *Richardson.* Indeed, this was so much the case that the *Gray* majority expressly "conceded" both that *Richardson* had "placed outside the scope of *Bruton's* rule those statements that incriminate inferentially" and that in a situation where a mere symbol of redaction was used, such as in *Gray* (and such as occurred here), "the jury must use inference to connect the statement ... with the defendant." 523 U.S. at 195, 118 S.Ct. 1151. The Court then went on to explain why its **departure** from *Richardson's* no-inferences rule was warranted. In short, then, it was not until *Gray* that the U.S. Supreme Court held—and, even then, only by a narrow 5–4 margin—that inferences from other parts of the record could properly be employed to prove a *Bruton* violation.

In this case, Elliott's redacted statement, viewed on its own, did not implicate appellant **at all.** As corroborated by the analyses employed by the lead opinion and the concurrence here, it requires reference to and inferences from other evidence to find anything in the redacted statement that could be said to implicate appellant. In light of this indisputable fact, the grant of relief here is nothing short of unfathomable.

I realize that the lead opinion has attempted to obscure its reliance on the analytical approach approved for the first time in *Gray* by moving its discussion of *Gray* to a footnote and insisting that it "does not rely on the holding in *Gray* " but, rather, looks to the decision "only for the [U.S. Supreme] Court's clarification of the distinction between *Bruton* and *[Richardson v.] Marsh.*" *Id.* But I fear that the lead opinion "doth protest too much," William Shakespeare, *Hamlet, Prince of Denmark,* act 3, sc. 2, and its actual analysis, which looks beyond Elliott's statement to consider other evidence at the trials and speculates as to what the juries might have "surmised" from that other evidence, thoroughly "informs

against" its protestation. *Id.*, act iv, sc. 32. The statement "X and I (or A and I) committed a crime" does not facially incriminate anyone but the speaker. In 1995 and 1996, replacing the defendant's name with a letter was a common method of redaction in this Commonwealth—one which this Court, when *Gray* was truly "absent" from its consideration because it did not yet exist, repeatedly approved.

It may well be true, as the lead opinion concludes, that when Detective Mangoni inadvertently referred to appellant as "X" when reciting Schneyder's preliminary hearing testimony, the jury could have "reasonably infer[red]" that the "X" that had been used in Elliott's statement also referred to appellant. But the redaction of Elliott's statement did not remotely convey that point on its own; instead, inference or linkage to Mangoni's testimony is required to make that leap. That being so, under *Richardson*, which was the governing authority at the time of the trials here, Elliott's redacted statement was properly admissible with a limiting instruction—which no doubt explains why appellant's counsel did not object to the redaction. Furthermore, when the detective erroneously redacted **Schneyder's** testimony, including her reference to appellant by name and nickname, appellant's trial counsel acted effectively in forwarding a timely and specific objection, to which the trial court responded in a fashion which appellant has not challenged.

Since the Court's *Bruton* analysis is so obviously erroneous under *Richardson*, I fear that what is really at work here is a *sub silentio* overruling of this Court's decision in *Commonwealth v. Lopez* on the question of whether *Gray* applies retroactively. The lead opinion recognizes that this Court in *Lopez* held that *Gray* constituted a new rule of law which cannot apply retroactively. Op. at 302–03 n. 15. However, three Justices—all of whom join in the Court's determination today to reverse the trial court's judgment of sentence and remand for a new trial—disagreed with the majority in *Lopez* on that point, stating that they "view[ed] the United States Supreme Court's decision in *Gray* as a rational application of the principles enunciated in *Bruton* rather than as a change in

the law." 739 A.2d at 507. In employing a *Gray*-dependent "contextual implication" analysis here, rather than the analysis dictated by the *Richardson* standard that actually governed in 1995–1996, it may be that the Court intends to *sub silentio* overrule the *Lopez* majority in favor of the failed concurrence.

Given this prospect, it is worth offering some brief comment on whether *Gray* should apply retroactively, notwithstanding that *Lopez* already said that it does not. I believe that Mr. Justice Nigro got it right in his majority opinion in *Lopez* when he held that *Gray* represented a change in the law. The U.S. Supreme Court's non-retroactivity/new rule jurisprudence, which derives from Justice O'Connor's seminal decision in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), does not turn upon whether a new decision involves a "rational application" of principles found in previous precedents. Indeed, most if not all constitutional decisions from the High Court at least attempt to follow, apply, and build upon what has gone before; and few, if any, of those decisions could be accused of "irrationally" departing from prior law. Instead of employing the "rational application" test for retroactivity posed by the *Lopez* concurrence, the U.S. Supreme Court's rather more sophisticated analysis focuses on whether the constitutional rule invoked by the defendant was "**dictated** by precedent" in existence at the relevant time. 489 U.S. at 301, 109 S.Ct. 1060 (emphasis original). If reasonable jurists could have disagreed over the point, the constitutional rule is new and cannot be applied retroactively. *Lambrix v. Singletary*, 520 U.S. 518, 528, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (new rule is not dictated by precedent unless it would be "apparent to all reasonable jurists"); *Caspari v. Bohlen*, 510 U.S. 383, 393, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (same); *Gilmore v. Taylor*, 508 U.S. 333, 347, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (O'Connor, J., concurring) (employing "susceptible to debate among reasonable jurists" test for new rule). *Accord Williams v. Taylor*, 529 U.S. 362, 409–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Majority Opinion of Court by O'Connor, J., on this point) (discussing dictated by precedent/ reasonable

jurist test); *id.* at 381–84, 120 S.Ct. 1495 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ. on this point) (same).[3]

It would be difficult in the extreme to characterize the contextual implication rule that emerged from *Gray,* and which the lead opinion applies here, as one that was **dictated** by the existing Bruton/Richardson precedent. First, as Mr. Justice Breyer explicitly noted in the *Gray* majority opinion, the question before the Court in that case—*i.e.,* "whether redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted' or a similar symbol, still falls within *Bruton's* protective rule"—was "a question that *Richardson* left open." 523 U.S. at 192, 118 S.Ct. 1151. Moreover, the *Gray* majority admitted that *Richardson* in fact had placed such statements, which require inferences to incriminate, outside of *Bruton.* Thus, *Gray* explicitly broke with previous precedent. Finally, no less than four reasonable jurists who participated in the *Gray* decision (Chief Justice Rehnquist, as well as Justices Scalia, Kennedy and Thomas) disagreed over whether the majority view in *Gray* was consistent with the principles undergirding the *Bruton* decision, much less whether the majority's view was "dictated" by that precedent and *Richardson.* In my view, then, Justice Nigro was unquestionably correct in *Lopez* when he concluded that *Gray* was a new rule. It is wrong for the Court today to contradict that holding with nary a word of explanation or illumination.

Moreover, even if *Gray* were deemed a retroactively applicable decision, appellant would not be entitled to its benefit. "Case law is clear ... that in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at 'all stages of adjudication up to and including the direct appeal.'" *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649, 652 (2001) (quoting *Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146, 148 (1983)). *Sub judice,*

**3.** The United States Supreme Court has recently reaffirmed the importance of accounting for retroactivity principles in determining the applicability of new rules, in the federal habeas context. *Horn v. Banks,* 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002).

appellant, having failed to advance any argument at trial approximating the then-nonexistent *Gray* rule—indeed, appellant made no attempt even to challenge Elliott's statement under then-prevailing *Bruton* law—is not entitled to the retroactive benefit of *Gray* on appeal.

Finally, I add some brief comment on the concurring opinion authored by Madame Justice Newman. Like the lead opinion, the concurrence apparently views the issue here as one sounding in trial court error under *Bruton/Gray*, not as the claim of counsel ineffectiveness briefed by the parties, and then analyzes the claim under a contextual implication approach. Concurring op. at 312. In my view, the concurrence commits the same multiple errors as the lead opinion in this regard.

The concurrence goes on to address a broader question, also not argued by the parties, of whether joint trials should be done away with in instances where *Bruton* issues may arise. *Id.* at 307. The concurrence expresses the view that "in all cases where there are multiple defendants, where one or more of the defendants has given a confessionary statement, where one or more of the defendants who gave confessionary statements will not testify, and where the Commonwealth plans to introduce the confessionary statement(s), the trial should be severed to avoid any possibility of running afoul of the Confrontation Clause." *Id.* at 307. The only limitation the concurrence would place on such a blanket rule is that "where there is no chance that the confessionary statement will prejudice the non-confessing co-defendant, it may be admitted and separate trials are not necessary." *Id.* at 307.

In response, I would note initially that this view, which derives from the dissenting opinion in *Richardson,* was expressly rejected by the six-justice majority in that case, with the following analysis:

One might say, of course, that a certain way of assuring compliance [with *Bruton* ] would be to try defendants separately whenever an incriminating statement of one of them is sought to be used. That is not as facile or as just a

remedy as might seem. Joint trials play a vital role in the criminal justice system, accounting for almost one-third of federal criminal trials in the past five years. Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more codefendants. Confessions by one or more of the defendants are commonplace—and indeed the probability of confession increases with the number of participants, since each has reduced assurance that he will be protected by his own silence. It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

481 U.S. at 209–10, 107 S.Ct. 1702 (citation omitted). *See also Commonwealth v. Wharton*, 530 Pa. 127, 607 A.2d 710, 718 n. 5 (1992) (Opinion by Zappala, J.) (recognizing that *Richardson* "rejected a rule of automatic severance of co-defendants' trials in these situations because of the 'vital role in the criminal justice system' which joint trials play"). *Accord Commonwealth v. Travers*, 768 A.2d at 847 ("Both this Court and the United States Supreme Court have recognized that joint trials of co-defendants play a crucial role in the criminal justice system"). Here, no less than in *Wharton*, our role in reviewing the federal claim requires us to effectuate the judgment of the Supreme Court majority, which rejected this alternative. *Wharton*. There is not now an absolute Sixth Amendment bar to joint trials involving confessions by non-testifying co-defen-

dants, and there was no such prohibition when appellant was tried.

In addition, the test proposed by the concurrence is unworkable as a practical matter. There is no requirement that a defendant must state before the defense presentation whether the defendant will testify or will not testify—much less is there a requirement that he be held to any stated position. Therefore, a trial court would not know whether to grant a separate trial for that defendant. The defense would be able to control the severability question by simply stating that the non-confessing defendant will not testify, when there is nothing that would prevent the defendant from testifying in a trial that was severed.

Further, it is practically impossible to determine whether there is "no chance that the confessionary statement will prejudice the non-confessing co-defendant." Since joint trials typically involve conspiracies, every redacted statement possesses at least a prospect of "spillover" prejudice; otherwise, such statement would be irrelevant to the issue of guilt or innocence of the confessing defendant. Indeed, that is why the U.S. Supreme Court created the *Bruton* exception to the rule that cautionary charges are alone always sufficient to avoid spillover prejudice. Nowhere in the law is there a "no chance of prejudice" standard when applied to evidentiary rulings. The scenario proposed by the concurrence joined by Chief Justice Zappala notwithstanding his majority authorship in *Wharton* would place a tremendous burden on the criminal justice system and be a waste of limited judicial resources.

The law expects trial judges to be impartial and competent in the law; it does not expect them to be clairvoyant or psychic. Because the trial court's failure to be prescient is not grounds for a new trial, I cannot join the Court's grant of relief on the fictional claim of trial court error it has raised *sua sponte* here. For all of the above reasons, I respectfully dissent.